IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| ------------------------------------------------------- ) <br>     Anne Smithers, James Mims,   ) <br>     Ross Wiley, Thomas Wiley,     ) <br>     Henry Wiley by his Mother and  ) <br>     next friend Anne Smithers, Hanna ) <br>     Del Signore,                            ) <br>                                      ) <br>            PLAINTIFFS,        ) <br>                                   ) <br> VS.                               ) <br>     Frontier Air Lines, Inc., and     ) <br>                                   ) <br>     Aircraft Service International, Inc., ) <br>                                   ) <br>            DEFENDANTS.    ) <br> ------------------------------------------------------- ) | Civil Action No.: 1:18cv676 (TSE/IDD) <br><br> SECOND AMENDED <br> COMPLAINT FOR NEGLIGENCE, <br> NEGLIGENT INFLICTION OF <br> EMOTIONAL DISTRESS, <br> DEFAMATION, BATTERY, <br> INTENTIONAL INFLICTION OF <br> EMOTIONAL DISTRESS, <br> AND BREACH OF CONTRACT <br> PURSUANT TO F.R.Cv.P. 15 (a)(2) |

INTRODUCTION

      This is an action against Frontier Air Lines (hereinafter "Frontier") and Aircraft Service International, Inc., doing business under the fictitious name "Menzies Aviation" (hereinafter "Menzies") for negligence, negligent infliction of emotional distress, defamation, battery, intentional infliction of emotional distress, and breach of contract, resulting from an incident that occurred on December 25, 2017 when Plaintiff Smithers was forcibly ejected from Defendant Frontier's flight due to a tweet that she sent while waiting to board, causing severe emotional trauma to herself and to her traveling family as further set forth below. This is Plaintiffs' Second Amended Complaint filed pursuant to F.R.Cv.P. 15(a)(2).

      When Plaintiff Smithers and her family appeared at 515 AM on Christmas Day 2017 at the Denver airport to fly from Denver home to the Commonwealth of Virginia, they watched as a

Frontier Pilot arrived, shirt untucked, with a lady friend in tow, and he collapsed into a seat at the gate. His feet and arms were splayed like he was impaired. He was wearing sunglasses, though it was still dark outside. He appeared to all the passengers waiting as if he needed more sleep or possibly was impaired. He lied down on the floor for a while as if he was sleeping on the floor. His appearance was outrageous and unexpected for a flight officer. As the plane continued to be delayed for claims the passengers could not corroborate, it was only after the pilot got up off the floor and made an inspection of the aircraft with his lady, not a member of the flight crew, that the departure seemed imminent. During this inspection the female companion appeared from cockpit windows taking pictures of her pilot companion, an action likely prohibited by Frontier and FAA rules. After departure, the co-pilot announced that he had become engaged the night before, Christmas Eve. It thus appears possible that the appearance and behavior of the recently betrothed pilot may have been due to insufficient required time between bottle and throttle (eight hours by FAA rule), or insufficient rest (varies by flight time and variables), and the Plaintiffs' concern about the pilot's outrageous behavior and the associated delay, were justified. Hence Plaintiff Smithers tweeted her concern and opinion to Frontier. What followed aboard the aircraft took matters to the extreme.

## JURISDICTION & VENUE

1. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.A. 1332 (a)(1) as to all causes of action herein.

2. Venue in this district has been selected by Plaintiffs pursuant to 28 U.S.C. § 1391 (b) (1) because it is a District in the United States where Plaintiffs reside and where Defendants conduct business.

3. The amount in controversy in this action exceeds $75,000.

## PARTIES AND JURISDICTION

4. Plaintiffs Anne Smithers, James Mims, Ross Wiley, Thomas Wiley, and Henry Wiley are domiciled in Virginia at 1918 Barribee Lane, Richmond, Virginia 23229 and purchased their tickets in the Commonwealth for round trip travel departing from and returning to the Commonwealth.

5. Plaintiff Hanna Del Signore is domiciled in Virginia at 8134 Poplar Grove Drive, Warrenton, Virginia 20187and purchased tickets in the Commonwealth for round trip travel departing from and returning to the Commonwealth

6. Frontier Air Lines is a Nevada corporation with its principal place of business in Colorado. Frontier has a place of business in the Eastern District of Virginia. Frontier regularly operates commercial air service into Dulles Airport, Reagan National Airport and Norfolk Int'l airport multiple times a week, and sells in this District tickets for carriage. The Plaintiffs' injuries arose on a Frontier flight to the Commonwealth of Virginia and their injuries continued in the Commonwealth. Pursuant to Virginia Code § 13.1-757, Frontier registered as a foreign corporation with the Virginia State Corporation Commission ("SCC") in order to transact any business in the Commonwealth. A foreign corporation may not transact business in the Commonwealth until it obtains a certificate of authority from the SCC. By registering to do business in the Commonwealth with the SCC and obtaining a certificate of authority, thereby availing itself of the benefits and privileges of the laws of the Commonwealth, by regularly flying passengers and cargo to and from and selling tickets for carriage within the

     Commonwealth, Frontier has purposefully availed itself of the privilege of conducting activities in the Commonwealth and has subjected itself to the sovereign laws of the Commonwealth. In addition, Frontier has substantial revenues and expenses in this District. More specifically, Frontier reached into the Commonwealth and sold Plaintiffs the tickets that formed the genesis of this dispute.

7. Menzies is a Delaware corporation with its principal place of business in Texas. Menzies has a place of business in the Eastern District of Virginia providing ground services at Reagan National Airport and, on information and belief, other airports in Virginia. The Plaintiffs' injuries arose on a Frontier flight to the Commonwealth of Virginia and their injuries continued in the Commonwealth. Pursuant to Virginia Code § 13.1-757, Menzies registered as a foreign corporation with the Virginia State Corporation Commission ("SCC") in order to transact any business in the Commonwealth. A foreign corporation may not transact business in the Commonwealth until it obtains a certificate of authority from the SCC. By registering to do business in the Commonwealth with the SCC, obtaining a certificate of authority, and thereby availing itself of the benefits and privileges of the laws of the Commonwealth, and by providing ground support services for Frontier within the Commonwealth, Menzies has purposefully availed itself of the jurisdictional means located in this District and otherwise has substantial revenues and expenses in this District. Upon information and belief, Menzies' contact with Plaintiffs began in the Commonwealth and continued throughout the orbit of Plaintiffs' journey, during which Menzies' employees came aboard the Frontier flight to Virginia that Plaintiffs' were aboard, and are responsible as a joint tortfeasor with Frontier for the Plaintiffs' injuries.

8. The injuries suffered by all of the Plaintiffs arise directly out of the Defendants' conduct and the injuries have a direct connection with each Defendant, because they arose as to Frontier because

of Frontier's commercial air service to the Commonwealth and selling tickets to Plaintiffs in the Commonwealth, and as to Menzies, arose out of their ground services business with Frontier, an integral component of Frontier's obligation to the Plaintiffs, and engagement of service to Plaintiffs which upon information and belief began and concluded in the Commonwealth and Plaintiff's injuries were suffered along the orbit of this service. The actions of Frontier and Menzies aboard the aircraft destined for the Commonwealth relate in both cases to the Defendants' respective conduct directed into the Commonwealth, commercial air service and ground handling.

9. The Virginia long arm statute, set forth in Virginia Code 8.01-328.1, provides that a court may exert personal jurisdiction over a person "[W]ho acts directly or through an agent, as to a cause of action arising from the person's: 1. Transacting any business in this Commonwealth; ... 3. Causing tortious injury by an act or omission in this Commonwealth; 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth; ...."

10. Each of the Plaintiffs has suffered tortious injury by an act of each of the Defendants both inside and outside of the Commonwealth and each of the Defendants has purposely availed themselves of the privilege of doing business in the Commonwealth, and has directed their conduct into the Commonwealth. Plaintiffs' injuries arise from activities both defendants directed into the Commonwealth. Accordingly under the Virginia Code long-arm statute, each Defendant is subject to court proceedings in the Commonwealth as a Defendant in this case.

11. Requiring the Defendants to defend these claims in this District in the Commonwealth is completely reasonable. Pursuant to the Commonwealth long-arm, the Commonwealth has a

direct interest in the adjudication of the Plaintiffs' claims. Both Defendants have directed their conduct in to the Commonwealth, supporting jurisdiction over them. The provision of an inherently dangerous service like commercial aviation and ground support in the Commonwealth certainly caused both Defendants to foresee there may be claims against them in the Commonwealth, and both Defendants bought insurance to cover and protect them from passenger injury litigation in Virginia arising out of their conduct directed into Virginia. Frontier's business is air travel, so it will not be inconvenient for Defendants and Defendants' witnesses to appear in the Commonwealth.

12. By allowing these claims to proceed in this District the fundamental substantive social policy of addressing jurisdiction for injury aboard aircraft for domestic and foreign flights would be harmonized. In the context of international travel, the Warsaw and Montreal Conventions allow the commencement of litigation in the Plaintiffs' District of domicile, whether there is general or specific or long arm jurisdiction over the air carrier, or not. Creating an unworkable and different scheme for jurisdiction of air travel that's domestic on the one hand, or purely international on the other, serves no substantive social policy. Had the Smithers clan held tickets beyond the Commonwealth to Europe, for example, then claims permitted to be heard would undisputably be heard in this Court.

## GENERAL ALLEGATION OF AGENCY

13. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendant Menzies and each of its respective agents, contractors and employees were the agent, servant and employees of Defendant Frontier, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.

## GENERAL ALLEGATION OF COMPLIANCE

14. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, in the course of their dealings with the Defendants, the Plaintiffs complied in all respects, whether or not material, with all conditions, requirements, ordinances, and legal and contractual undertakings incumbent upon them in connection with their Contracts with Defendant Frontier, and with the rules and ordinances of the authorities at the airport of departure and proposed arrival, all aircraft placards and all crew member instructions.

## FACTUAL ALLEGATIONS

15. Plaintiffs booked travel in Virginia with Frontier Airlines to fly round trip and return from Denver International to Washington Reagan Airport on the morning of December 25, 2017.

16. Plaintiffs arrived at the gate for their flight at 5:15AM.

17. The flight was scheduled to leave at 7:00 AM local time in Denver.

18. At approximately 6:00 AM, Plaintiffs Ross and Hanna first observed the co-pilot slumped in his seat with shirt untucked and sunglasses on, though it was still dark outside.

19. At approximately 6:15 AM, the co-pilot and his companion approached the boarding counter and interacted briefly with the gate agent, whereupon the copilot returned to his seat where he sprawled out with his sunglasses askew on his face.

20. At approximately 6:30 AM an announcement was made that there was a delay due to a need for life preservers.

21. Over the course of the next two hours, the copilot and his companion slept on the floor behind the ticketing counter and then the copilot sprawled in a wheelchair for a while.

22. At roughly 9:15 the copilot and his companion went out to the tarmac, where he proceeded to take pictures of his companion leaning out the cockpit window and elsewhere.

23. At this point a family seated next to the Plaintiffs turned and incredulously asked Plaintiffs "is this our pilot?"

24. Plaintiff Smithers messaged Frontier at this time to complain about the delay and also tweeted "@FlyFrontier really absurd that we have a two hour delay and for the copilot to sober up!! WTH thanks for ruining Christmas!"

25. It was also the opinion of multiple passengers who conversed with the Plaintiffs that the copilot was recovering from a "big night."

26. Passengers were becoming increasingly angry at the delay, voices were escalating and some began shouting at the ticket counter.

27. At no point did any Plaintiff observe life jackets being loaded on the plane. Prior to the commencement of this action, Defendant Frontier provided Plaintiffs' counsel with documents evidencing the life preservers required for the aircraft were removed from inventory in Denver at about 9 PM local time in Denver the prior evening. The indications on those documents suggest the aircraft was not legal to fly until those preservers were installed.

28. At 10:30 AM, the plane finally boarded and the doors were shut.

29. At 10:35 AM, the pilot announced that they needed to refuel, the ramp came back to the door, the door was opened and two women boarded the plane, one in a red shirt and the other in green.

30. It is Plaintiffs' belief based upon assertions made by Frontier's Chicago counsel that these two unidentified women are Menzies' employees who were acting both in a direct capacity for Menzies and consequently as agents for Frontier.

31. The two women approached Plaintiff Smithers' row and said loudly to the woman sitting in the same row across the aisle: "Anne Smithers you need to come with us!"

32. Plaintiff Smithers immediately said: "I am Anne Smithers." Whereupon the woman in the red shirt turned around, struck Plaintiff Smithers on the shoulder and told her to shut up.

33. After erroneously removing the wrong passenger, the two women came back and removed Plaintiff Smithers.

34. When Plaintiff Smithers asked what was going on, she was told: "you are not allowed to tweet."

35. Plaintiff Smithers was fearful of protesting as the demeanor of these two women was extremely hostile and she had already been struck once.

36. As she was being removed from the plane, Plaintiff Smithers asked again why they were doing this and the woman replied that the copilot had requested her removal because he was offended by her tweet.

37. Plaintiff Smithers replied that she was not leaving her children, whereupon the woman replied that, "you should have thought about that before you tweeted."

38. At this point the red-shirted woman was still aboard the plane blocking the Plaintiff children and Plaintiff Mims from following Plaintiff Smithers off the plane.

39. The red-shirted woman told them: "If you get off the plane, you will be stranded in Denver. You will not fly, you will not get your luggage back. Your mother has committed a felony and will be going to jail or will have to pay a very large fine."

40. This caused acute distress to the children and to Plaintiff Mims.

41. Plaintiff Smithers' son, Plaintiff Henry Wiley, is extremely asthmatic and Plaintiff Smithers carried his medication in her purse, including a small nebulizer.

42. Plaintiff Henry Wiley has been to the hospital over a dozen times in asthma-related emergencies.

43. Plaintiff Henry Wiley had no other form of asthma medication available to him on this flight other than the portable nebulizer carried by his mother.

44. After being taken back to the counter, Plaintiff Smithers informed the green shirted woman that she had her son's medication, that he was extremely asthmatic and he needed his nebulizer.

45. The green-shirted woman ignored Plaintiff Smithers and continued to type.

46. At this point Plaintiff Mims exited the plane with the red-shirted woman and informed Plaintiff Smithers that he had instructed the children to remain on the plane, that they all were visibly shaking and that Plaintiff Del Signore was in tears. He had decided to exit to find out where they were taking Plaintiff Smithers.

47. Plaintiff Mims was unaware that Plaintiff Smithers was in possession of Plaintiff Wiley's needed medication until after he exited the plane.

48. Another passenger, possibly an air marshal, exited the plane at this point and approached the counter and told the green shirted woman that "this was ridiculous." She ignored him.

49. This passenger then informed Plaintiffs Smithers and Mims that it was ok to film what was occurring. This, coupled with the fact that he had exited the flight with them and did not return, reinforced the Plaintiffs' belief that the mystery passenger was an air marshal.

50. The green shirted woman came back around the counter at this point and Plaintiff Smithers protested again that she had her son's nebulizer and he was a bad asthmatic.

51. The woman responded: "you should have thought about that before you tweeted."

52. The woman then said: "you will need to leave the airport. You will not be flying today and maybe never again."

53. At this point, before she could protest further, police arrived at Frontier's request and escorted Plaintiff Smithers away from the gate.

54. Plaintiff Smithers asked the policeman what law she had broken and he informed her: "you did nothing wrong. No laws were broken. This is a Frontier problem."

55. On the return flight, Plaintiff Henry Wiley felt extreme stress and began wheezing. He felt the physical symptoms of an impending attack, including extreme tightness and these symptoms caused him intense fear for the entire flight, as he was without his medication. He fought panic.

56. Plaintiff Henry Wiley considered informing the flight crew that he might have a medical emergency but was afraid to do so after what had happened to his mother.

57. The other Plaintiffs aboard the flight were also afraid for Plaintiff Henry Wiley's safety for the entire duration of the flight.

58. Upon landing, Plaintiff Henry Wiley went immediately to his brother's house nearby, where there was a nebulizer, and gave himself a treatment before returning to Richmond.

59. Upon information and belief, Menzies is a ground handling company that performs services for Frontier Airlines which include ticketing and passenger relations.

AS AND FOR A CAUSE OF ACTION FOR NEGLIGENCE BY ALL NAMED PLAINTIFFS

60. Paragraphs 1-59 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

61. Defendant Frontier had a duty as a common carrier to exercise a reasonable duty of care for the well-being and treatment of its passengers.

62. Defendant Menzies, as agents of Frontier, had a duty as agents of a common carrier to exercise a reasonable duty of care for the well-being and treatment of its passengers.

11

63. Both Defendants had a duty to exercise ordinary care commensurate with the existing circumstances.

64. It was reasonably foreseeable that Defendants' improper treatment of the Plaintiffs could result in aggravation, inconvenience, monetary damage, extreme distress and deprive them all of a valuable and anticipated Christmas holiday spent home together as a family.

65. Defendants breached their duty to Plaintiffs by baselessly ejecting Plaintiff Smithers from the aircraft, defaming her in front of all the passengers heading to Virginia, forcibly separating her from her children, and abusing process by calling the police who confirmed Plaintiff Smithers had done nothing wrong.

66. Defendants breached their duty of a common carrier to the Plaintiffs by the cruel and callous treatment to which they subjected Plaintiff Smithers and her traveling family, including striking Plaintiff Smithers, falsely accusing her of a crime, informing the family that she had committed a felony and would likely be incarcerated within earshot of other Virginia bound passengers, refusing to allow Plaintiff Smithers to return needed medical equipment to her dangerously asthmatic son and ensuring that the Christmas holiday would be ruined for the entire family.

67. Defendants breached their duty of care as a common carrier by needlessly terrifying the entire family and by needlessly endangering the safety of Plaintiff Henry Wiley.

68. As a result, all Plaintiffs suffered great inconvenience, embarrassment, and severe emotional distress from this outrageous conduct, damages which continued to affect all Plaintiffs after their return to the Commonwealth.

69. As a result, Plaintiff Smithers suffered a loss of reputation and monetary damages.

## AS FOR A SECOND CAUSE OF ACTION FOR DEFAMATION BY PLAINTIFF SMITHERS

70. Paragraphs 1-69 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

71. Defendant Menzies' employee made a defamatory statement when she informed Plaintiff Smithers' traveling family and all passengers within earshot that Plaintiff Smithers had committed a felony and was likely going to jail.

72. Defendant Menzies' employee was aboard the aircraft headed to Virginia and was acting as an agent of Frontier when she made the defamatory statement.

73. Defendant Menzies' employee made the defamatory statement during the course of performing the regular activities of her employment and her interaction with Plaintiff Smithers was motivated by a desire to serve her employer. She was aboard the aircraft headed to the Commonwealth to engage in the "service" of settling passengers aboard and removing Plaintiff Smithers.

74. The nature of Defendant Menzies' employee's job function including removing passengers raised the likelihood of the potential employee misconduct of defaming a passenger while performing her duties.

75. The defamatory statement was published to the family and to dozens of surrounding seated passengers headed to the Commonwealth.

76. Defendants knew or had reason to know that this statement was false.

77. By accusing Plaintiff Smithers of committing a serious crime, Defendants are liable for per se damages and special damages need not be pled.

78. Plaintiff Smithers suffered economic and non-economic damages in both Colorado and Virginia as a result of Defendants' defamation.

AS AND FOR A THIRD CAUSE OF ACTION FOR BATTERY, BY PLAINTIFF SMITHERS

79. Paragraphs 1-78 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

80. Defendant Menzie's employee struck Plaintiff Smithers on the shoulder and told her to "shut up."

81. Defendant Menzies' employee was acting as an agent of Frontier when she struck Plaintiff Smithers and had a duty to care for Smithers in a reasonable fashion as a common carrier should.

82. Defendant Menzies' employee struck Plaintiff Smithers during the course of performing the regular activities of her employment aboard the aircraft, settling passengers and assisting in seat selection, and her interaction with Plaintiff Smithers was motivated by a desire to serve her employer.

83. The nature of Defendant Menzies' employee's job function raised the likelihood of the potential employee misconduct of striking a passenger while performing her duties.

84. By striking Plaintiff Smithers on the shoulder, Defendants intended to cause and did cause an offensive physical contact.

85. It offended Plaintiff Smither's sense of dignity to have her shoulder struck.

86. Defendants' demeanor throughout the interaction with Plaintiff Smithers was intense and hostile. It appeared offensive.

87. Plaintiff Smithers suffered damages in both Colorado and Virginia as a result that included fear, embarrassment, anxiety, indignity, loss of sleep, stress, emotional trauma, pain and suffering and

PTSD[1] that has resulted in ongoing medical treatment and expense. Defendants Menzies and Frontier are liable for these damages

88. Additionally, Defendant's behavior was willful and wanton and done with malice and Defendant is liable as a result for punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, BY PLAINTIFF SMITHERS

89. Paragraphs 1-88 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

90. Throughout the entire course of their interactions with Plaintiff Smithers, both Menzies employees were acting as agents of Frontier and in the interest of serving their employer by conducting passenger seating and passenger removal aboard the Frontier aircraft headed to the Commonwealth. It was foreseeable that the nature of the task they were given to perform (ejecting Plaintiff Smithers from the flight) could result in the outrageous conduct they exhibited.

91. Defendants engaged in extreme and outrageous conduct towards Plaintiff Smithers by ejecting her from the flight with no proper cause.

92. Defendants engaged in extreme and outrageous conduct towards Plaintiff Smithers by striking her, attempting to have police remove her from the airport which was an abuse of process and by their extremely hostile and threatening demeanor.

93. Defendants engaged in extreme and outrageous conduct towards Plaintiff Smithers by terrifying her and by falsely announcing on board to all Commonwealth bound passengers and Smithers' children that she had committed a felony and would likely be jailed.

---

[1] Post-Traumatic Stress Disorder

94. Defendants engaged in extreme and outrageous conduct towards Plaintiff Smithers by refusing to allow her to send her son's needed nebulizer back aboard, even though Defendants had been informed that Smithers' son was an extreme asthmatic and could thus reasonably understand the increased danger that he would suffer an asthmatic attack due to the stress and anxiety that Defendants had created, and not have his life saving medication.

95. The accumulation and totality of Defendants outrageous behavior towards Plaintiff Smithers inspires greater outrage than each act standing alone and is sufficient for a reasonable observer to exclaim "that's outrageous!"

96. Defendants' behavior intentionally or recklessly caused severe emotional distress to Plaintiff Smithers and shocks the conscience.

97. Plaintiff Smithers suffered acute terror throughout the duration of the incident, both that she would be taken to jail and then that her son would have an attack.

98. The complete loss of control and ability for a stranger to abuse her and her family with impunity was severely and lastingly emotionally traumatic.

99. The emotional trauma of the event was so severe for Plaintiff Smithers that the reverberations of its impact have caused lasting harm, resulting in a diagnosis for PTSD and the need for Plaintiff Smithers to seek ongoing treatment for the residual emotional trauma.. There is no diagnosis as to how long treatment may be required.

AS AND FOR A FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT, BY PLAINTIFF SMITHERS

100. Paragraphs 1-99 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

101. Plaintiff Smithers and Defendant Frontier entered into a contract of carriage to transport Plaintiff Smithers from Denver, Colorado to Washington Reagan Airport in Virginia.

102. As consideration for this contract, Plaintiff Smithers paid $188.40.

103. Plaintiff Smithers complied in every way with the conditions of the contract.

104. Under the terms of the contract, Frontier may refuse carriage for a limited set of reasons, none of which were applicable when they refused to carry Plaintiff Smithers.

105. Plaintiff Smithers had not been banned to fly Frontier when she purchased her ticket and her tweet in no way interfered with the duties of the flight crew.

106. By refusing to carry Plaintiff Smithers after she had purchased a valid ticket and engaged in a binding contract, Defendant Frontier breached the contract by its refusal to perform.

107. As a result, Plaintiff Smithers suffered damages amounting to the difference between the $188.40 that she paid for her ticket and the $112 that was refunded, and all other foreseeable damages from the breach, like extra food expense, a replacement ticket home to the Commonwealth, and other incidentals..

## AS AND FOR A SIXTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY PLAINTIFF HENRY WILEY

108. Paragraphs 1-107 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

109. Defendants' negligence in refusing the return of Henry Wiley's needed medical equipment caused an unreasonable risk of physical harm to Plaintiff Wiley.

110. The deprivation of his nebulizer caused Plaintiff Wiley to be put in acute fear for his safety.

111. The acute fear that Plaintiff Wiley felt caused the physical symptoms of an asthma attack to begin to manifest, resulting in wheezing and tightness of breath.

112. These symptoms persisted and the acute fear caused by these symptoms persisted until Plaintiff Wiley was able to reach his backup nebulizer in Virginia and give himself a treatment.

113. Plaintiff Wiley suffered damages as a result of the fear that was negligently inflicted upon him and Defendants are liable for these damages.

## PRAYER FOR RELIEF

114. Wherefore, Plaintiffs pray for relief from this Honorable Court as follows:

115. On the first cause of action for negligence, an amount to be determined at trial, but not less than $125,000.

116. On the second cause of action for defamation, an amount to be determined at trial, but not less than $125,000.

117. On the third cause of action for battery, an amount to be determined at trial, but not less than $125,000.

118. On the fourth cause of action for intentional infliction of emotional distress, an amount to be determined at trial, but not less than $125,000.

119. On the fifth cause of action for breach of contract, $76.40 and other foreseeable expenses resulting from the breach.

120. On the sixth cause of action for negligent infliction of emotional distress, an amount to be determined at trial, but not less than $125,000.

JURY TRIAL

121. Pursuant to the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

    Respectfully Submitted,

    /s/ Thatcher A. Stone
Thatcher A. Stone (admitted PHV)
    /s/ William T. Woodrow III
William T. Woodrow III (VSB 88122)
Stone & Woodrow LLP
250 West Main Street, Suite 201
Charlottesville, VA 22902
Email:   thatcher@stoneandwoodrowlaw.com
        will@stoneandwoodrowlaw.com
Phone: (855) 275-7378
*Attorneys for Plaintiffs*