IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

------------------------------------------------------- )
    Anne Smithers, James Mims,      )
    Ross Wiley, Thomas Wiley,      )    Civil Action No.:  1:18cv676 (TSE/IDD)
    Henry Wiley by his Mother and   )
    next friend Anne Smithers, Hanna )
    Del Signore,                  )
                             )    PLAINTIFFS' OMNIBUS RESPONSE
            PLAINTIFFS,   )    IN OPPOSITION TO DEFENDANTS'
VS.                       )    MOTIONS (ECF 37, 40) TO DISMISS
    Frontier Air Lines, Inc.,  and    )    PLAINTIFFS' SECOND AMENDED
    Aircraft Service International, Inc., )    COMPLAINT (ECF 36)
                             )
           DEFENDANTS.   )
------------------------------------------------------- )

**INTRODUCTION**

     Plaintiffs hereby submit to the Court Plaintiffs' Omnibus Response in Opposition to Defendants' Motions (ECF 37,40) to Dismiss Plaintiffs' Second Amended Complaint (ECF 36). As many of Defendants' arguments are redundant of their prior motions, Plaintiffs incorporate by reference in its entirety Plaintiffs' prior Response in Opposition to Defendants' Motions to Dismiss (ECF 31).   For the reasons stated therein and as supplemented by arguments below, Defendants' motion should be denied in its entirety and this case should move towards discovery and trial.

**This Court Has Specific Personal Jurisdiction Over Both Defendants**

     The fact that both Defendants have extensive contacts with Virginia does not by itself produce specific jurisdiction, but it is a positive weight in the jurisdictional analysis.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (U.S. 2011) ("Flow of a manufacturer's

1

products into the forum, we have explained, may bolster an affiliation germane to specific jurisdiction.").

To find specific jurisdiction there must also be "an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.,* 137 S. Ct. 1773, 1781(2017) (citing *Goodyear*, 564 U.S., at 919).

Courts in the Eastern District of Virginia and elsewhere in the 4th Circuit that have addressed the question of air travelers and jurisdiction in the Federal courts to permit claims against tortious and negligent carriers have found specific personal jurisdiction in cases where the ultimate injury did not occur in the forum state but where the parties relationship began there. See *Selke v. Germanwings GMBH* , 261 F. Supp.3d 645 (2017); *Broadus v. Delta Air Lines, Inc*, 101 F.Supp.3d 554 (2015). These courts used the rationale that the airlines reached into the forum state to sell the passengers the ticket that was the first causal link in the ultimate injury.

### 1. *Defendant Frontier Airlines*

Defendant Frontier's arguments that *Selke* and *Broadus* are inapposite to the facts at hand are wholly unconvincing. Defendant attempts to manufacture meaningless distinctions that were never articulated or even hinted at by either Court. Why should it matter whether a flight is in the air or on the ground, or whether a flight is inbound or outbound? The passengers are entrusting their well-being to the airline along every step of the journey.... a journey that commenced with the purchase of tickets in the forum state, the Commonwealth of Virginia.

Furthermore, Defendant's argument that there is a paradox between *Selke* and the Virginia long-arm statute, §8.01-328.1(A)(1-10)[1] seems rather specious. Defendants maintain that Plaintiffs must address the long arm statute under (A)(4), thereby fatally conceding that the injury happened outside the Commonwealth and thus undermining the *Selke* rationale. But leaving aside the fact that the *Selke* Court saw no such conflict, it is unclear why such a paradox would exist, except through torturing various excerpts from cases to make it appear so. The Virginia long arm statute is satisfied in this action by reliance upon sub-sections (A)(1), (A)(3), or (A)(4), depending upon the rationale used. Either the injury occurred outside Virginia and the damages continued into Virginia as the Complaint alleges, or a causal component of the injury occurred in Virginia with the sale of the tickets. The bottom line is that the Fourth Circuit considers the statute to sweep as broadly as the bounds of due process allow. See *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982) ("The Virginia long-arm statute... has been construed to extend in personam jurisdiction to the outmost perimeters of due process.").

Defendants argue that "this case is more akin to *Mali v. British Airways*, 2018 U.S. Dist. LEXIS 112994 (S.D.N.Y. July 6, 2018)." (ECF 41, Pg. 9) This is an amazing conclusion since the Plaintiff in *Mali* proceeding in a New York Federal Court did not live in – *or purchase his tickets in* – New York! *Mali,* at 1("Plaintiff purchased a round-trip ticket from Chicago to Mumbai, with layovers in London in each direction.")

---

[1] a court may exert personal jurisdiction over a person "[W]ho acts directly or through an agent, as to a cause of action arising from the person's: 1. Transacting any business in this Commonwealth; ... 3. Causing tortious injury by an act or omission in this Commonwealth; 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth; ...."

In fact, the Plaintiff in *Mali* knew the importance of where his tickets were purchased because he attempted an unconvincing argument that his ticket payment would have been routed through a British Airways bank account in New York. *Mali,* at 7("Plaintiff ascribes undue reliance on Defendant's bank transactions in New York...while his ticket purchase transaction may have passed through or occurred in New York, such facts are insufficient to warrant the exercise of specific jurisdiction over these claims.")

It is truly hard to imagine how this New York case is more similar and instructive to the facts at hand than the Fourth Circuit cases that the Plaintiffs have cited. A man who doesn't live in NY, doesn't buy his tickets in NY, doesn't pass through NY, bringing an action in a Federal Court in NY, versus Plaintiffs who live in Virginia, buy their tickets in Virginia, and travel round trip from and to Virginia... *Exactly like the Plaintiffs in Selke.*

There is no policy, legal basis or authority that should cause this Court not to follow *Selke.*

## 2. *Defendant ASI*

In this case, Plaintiffs establish a prima facie claim of jurisdiction because ASI was registered with the Virginia SCC, provided ground handling to the Plaintiffs *in both Virginia* and Colorado, pursuant to tickets sold in Virginia, and the 2nd Amended Complaint alleges ASI has a major presence in the Commonwealth, as well. Accordingly, *Zalatel v Prisma Labs, Inc.*, 226 F.Supp. 3d 599, 612 (E.D. VA 2016) is inapposite to this case. ASI registered with the Virginia SCC to purposefully avail itself of the laws of the Commonwealth. The Defendant in Zalatel did not.

ASI is a contractual agent of Frontier to provide ground handling services, as it admits in its motion to dismiss. It provides services to Frontier that Frontier does not provide directly to its

passengers but which are part of the services a passenger purchases when she buys a ticket. It is an agent of Frontier in doing so. In this case ASI employees came aboard the aircraft, struck and defamed the Plaintiff Anne Smithers, both intentional torts.  Then these same ASI employees refused the Plaintiff Anne Smithers access to her child, to transfer to him much needed medical equipment. That refusal was a violation of a common carrier's obligation to treat passengers with a duty of care. Those ASI employees as agents of Frontier are at the essence of this dispute.

ASI's employees perform a necessary service for every Frontier passenger that Frontier does not provide. They provide ground handling and so are part and parcel of the air travel service a Frontier passenger purchases when she purchases a Frontier ticket. There is no separate ticket that a Frontier passenger must purchase in order to enjoy the luggage and other ground handling service provided by ASI and implicit in any travel offered by Frontier. Here the 2nd Amended Complaint alleges that ASI personnel came aboard the Aircraft, committed intentional torts, and then assumed control of the check-in gate, all as an agent of Frontier and presumably pursuant to a ground  handling contract.

As a legal matter one can safely argue that a Frontier passenger is a third party beneficiary of the contract between Frontier and ASI because it reflects the services she expects to obtain from ASI when she buys a ticket and goes aboard a Frontier aircraft. See, e.g., *Bank of America v. Musselman*, 240 F. Supp 547 (E.D. VA)(Ellis, J.). Clearly the contract between ASI and Frontier is of principal benefit to the passenger, because ASI will perform services required by both Frontier and the passenger, who needs such service to embark, disembark and obtain luggage and thus although not a party to the contract, is an intended third party beneficiary. As the airline's agent, ASI owed a duty to the passengers in this case, which it clearly breached.

Defendant ASI's reliance on *PBM Capital Invs., LLC v. Gen. Elec. Co.*, 2016 U.S. Dist. LEXIS 96055, at *7 (W.D. Va. July 22, 2016) is misplaced. In that case the Court held there was no general jurisdiction and no specific jurisdiction, because nothing whatsoever happened in Virginia. A party was located in Virginia, but the troubled business relationship was created elsewhere and not in Virginia. Here, we have a third party beneficiary Plaintiff who bought her tickets in the Commonwealth, completely unlike the circumstances in *PBM*, and in buying her tickets, was relying on ASI to provide services, services which commenced in the Commonwealth during the outbound leg and resumed in Denver where the injury occurred, until finally concluding (for most of the family) upon return to the Commonwealth. *The Plaintiffs' relationship with ASI began and concluded in the Commonwealth.*

Finally, ASI's reliance on *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 (4th Cir. 2009) is also misplaced. ASI relies on that case by claiming no element of the Plaintiff's claim occurred in Virginia. But as Frontier's agent, it is clear that the tickets purchased in Virginia tied ASI and its services to the Plaintiffs right here in the Commonwealth. ASI was there providing passenger services for Frontier when the Plaintiffs embarked and disembarked in Virginia. When Plaintiffs embarked, and when they disembarked at the end of their trip, ASI was tied to a causal link in Virginia. They performed ground handling in Virginia for the Plaintiffs and were tied to Virginia because that's where the Plaintiffs' tickets were sold.

The principles articulated in *Selke* can and should be applied with respect to ASI, where the Court found specific jurisdiction over a defendant whose relationship began with the Plaintiff in Virginia. The Court should deny the motion of ASI under FRCvP 12(b) to dismiss the 2nd Amended Complaint for lack of jurisdiction.

**Plaintiffs' Negligence Claims Are Sound**

### 1. *Defendants Owed a Duty of Care*

Defendants spend many words on Colorado's economic loss rule but "the economic loss rule has no application where a plaintiff's tort claim is based on an independent duty of care." *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 867 (Colo. 2005).

Three factors determine whether a duty is not subject to the economic loss rule: "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004).

"A court's determination regarding the existence of a legal duty is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." *Ryder v. Mitchell*, 54 P.3d 885, 889–90 (Colo. 2002).

"Because no one factor controls the analysis, the question of whether a duty exists in a certain situation is based on fairness under contemporary standards—that is, would reasonable persons recognize and agree that a duty of care exists." *Id*.

Colorado adopted the common law doctrine that common carriers are subject to a higher degree of care in negligence actions. *Bedee v. Am. Med. Response of Colorado*, 361 P.3d 1083, 1092 (2015).

Common carriers have a duty to "exercise the highest degree of care and the slightest deviation from this constitutes negligence toward the passenger." *Publix Cab Co. v. Fessler*, 335 P.2d 865, 868 (1959)

Colorado courts regularly refer to airlines as common carriers.  See *Wyatt v. United Airlines, Inc.*, 638 P.2d 812, 814 (Colo. App. 1981)( "United Airlines is a common carrier and its duty to plaintiff arose in Colorado."); *Aspen Airways, Inc. v. Pub. Utilities Comm'n*, 453 P.2d 789, 790 (1969)("Aspen Airways holds a certificate to conduct, as a common carrier, both scheduled air service and charter service based in the town of Aspen, Colorado.")

Defendants repeatedly make the argument that everything that happened to Ms. Smithers and her family was contemplated by the contract but "reasonable persons" cry foul.  It is true that if Ms. Smithers had been politely escorted off the flight, she would have had only a claim for breach of contract, but it is just as true that the Defendants had a common law duty *to be reasonable in the circumstances* and to *not otherwise cause injury*.  The  Plaintiffs' negligence claims are not rooted in the economics and agreement of the contract; they are wholly based upon the indecent and outrageous abuse they received at the hands of individuals who held power over them.  Defendants had a duty of care, rooted in the common law and enhanced by their status of  a common carrier, to act reasonably in the circumstances to avoid harm.  This they clearly did not do, and the Plaintiffs suffered harm beyond any mere contractual default.

## 2. *Negligence Towards The Children*

Defendants argue that none of the children suffered harm because they all completed their flight, but clearly the entire family was unnecessarily traumatized, and Henry was placed in danger.  Additionally, the entire family suffered reputational harm and were diminished in the eyes of traveling passengers.  The entire family suffered discomfort and embarrassment due to Defendants' actions.  They were unnecessarily aggravated, offended and acutely distressed.  But perhaps equally important is the fact that this was Christmas morning – for many the most special and cherished day of the year.  Defendants callously and deliberately ruined it for the

entire family.  The mother of this family wasn't merely being delayed in her travel:  the family was cruelly being obstructed in their efforts to return home and celebrate Christmas together. Unsurprisingly, the entire family spent the day in turmoil, distress, and chaos, rather than in a celebration of life and family.

It is for a jury to decide what value to assign to these claims, and some, of course, carry less weight than others, but every negligence claim in this action is legally sound and all Plaintiffs have a right to see the Defendants rebuked.

**Negligent Infliction Of Emotional Distress**

"To establish the claim, a plaintiff must show that the defendant's negligence created an unreasonable risk of physical harm and caused the plaintiff to be put in fear for his or her own safety, that this fear had physical consequences or resulted in long-continued emotional disturbance, and that the plaintiff's fear was the cause of the damages sought." *Draper v. DeFrenchi-Gordineer,* 282 P.3d 489, 496–97 (Colo. App. 2011).

Defendants, in their motion, shade and editorialize the facts alleged in the Complaint, but let's assume for the sake of a 12(b)(6) motion that the facts are accurate and true as the Plaintiffs have pled them – in fact, that they are interpreted in the light most favorable to the Plaintiffs.

Henry Wiley – a minor – was wheezing and fighting panic the whole flight back *and after disembarkation* until he reached his spare nebulizer – the first and greatest priority for the entire traveling family as soon as they landed. (ECF  36 at  ¶¶s 55, 57, 58). He was in great risk of physical harm and well aware of it.  (*Id*. at ¶¶s 41-43).  He considered declaring an emergency, but was attempting to stay calm and did not have much faith  in the crew after what he had witnessed. (*Id*. at ¶56).  Henry Wiley is not a garden variety asthmatic:  he has been rushed to the hospital repeatedly in asthma-related emergencies. (*Id*. at ¶42).  The fact that the

9

mother carried a nebulizer in her purse rather than an inhaler is an indication of his severe condition. (*Id*. at ¶41).

Defendants imply that Plaintiffs are overblowing the incident since Mims instructed Henry to remain on the plane with the other kids and then Mims exited.  (ECF 41 at Pg. 18). And Defendants say nobody ever declared an emergency so it must not have been a big deal.  (*Id*. at Pg. 17).  Defendants claim that  Henry's symptoms just subsided after the flight (*Id*.) though Plaintiffs clearly allege that the danger did not pass until after an urgent and immediate trip to his brother's house and a spare nebulizer.  (ECF 36 at ¶ 58).  Defendants even have the nerve to write: "There is nothing in the Second Amended Complaint that suggests that Defendant Frontier engaged in any action that placed Mr. Wiley in an unreasonable risk of physical harm or caused Mr. Wiley to be in fear for his safety.." (ECF 41, Pg. 18).  Except for the numerous paragraphs in the Complaint that explicitly allege so!

With all facts being viewed in the light most favorable to the Plaintiffs and having the added benefit of being actually true, this is the scenario that occurred for purposes of this motion: it was a moment of shock and crisis that occurred in the blink of an eye and left all Plaintiffs reeling in an effort to keep up.  The kids didn't know what was going on.  The mother didn't know what was going on.  Mims didn't know what was going on.  And then the plane was gone, and the realization of the ramifications had time to sink in.  Mims had no idea that Henry wasn't carrying his own nebulizer until he left the flight to see if he could help the mother.  (ECF 36 at ¶47).  And then the plane immediately left.  It had just briefly pulled back to the gate in order for Smithers to be ejected...it wasted no time.  (ECF 36 at ¶¶s28-29).  Why didn't the Plaintiffs make a bigger deal if it was such a big deal?  Because there were only a few brief seconds and everyone involved was completely overwhelmed with shock.  Sure, if the plane had stayed for

another five minutes, Smithers could have started screaming at the top of her lungs until they let her return the nebulizer to Henry – she would have had time to accurately process and weigh priorities, demand at the least Henry's removal from the flight.  Maybe Henry would have removed himself when he realized that his mother wasn't returning and felt the onset of an attack, but even at this point he would have had no idea that his mother wasn't in handcuffs in the back of a police car.  Maybe he would be stranded by himself in the Denver airport having an attack.

The fact was that Ms. Smithers and her family had only seconds, and Ms. Smithers was thinking about getting handcuffed and going to jail and watching a police officer approach to maybe do just that.  (*Id*. at ¶53). Ms. Smithers was panicking for herself in those brief moments while the plane departed and yet she still had the presence of mind to insist twice that she be allowed to return Henry's nebulizer, and twice she was refused.  (*Id*. at ¶¶s 44-45, 50-51).  And then it was too late.

Defendants may not, at this 12(b)(6) stage, claim that they did not put Henry Wiley in an unreasonable risk of physical harm, and Defendants may not argue that Henry Wiley was not in acute fear for his safety.  The only aspect of the tort that Defendants may challenge is whether the fear caused sufficient physical manifestations.  That is a question for the Court.

However, the Court should not rely upon the cases cited by Defendants in their motion. *Atsepoyi v. Tandy Corp*., 51 F. Supp. 2d 1120, 1127 (D. Colo. 1999) reflects a situation where the Plaintiff was claiming that insults had caused him distress and placed him in "the zone of danger."  The court correctly held that there need be a real risk of danger – "danger" can't be boot-strapped up from  mere distress.

> Tandy asks me to dismiss this claim because Atsepoyi does not allege his employer subjected him to an unreasonable risk of bodily harm placing him within the "zone of danger." (Def.'s Mot. Dismiss at 11.) Defendant correctly relies on the "zone of danger" rule discussed in Card v. Blakeslee, 937 P.2d 846 (Colo.App.1996). According to Card, if the plaintiff is not subject to a direct threat of harm or an unreasonable risk of bodily harm, then he is not within the "zone of danger," and therefore, cannot recover under this claim.

*Id.*

What Defendants fail to acknowledge when they equate *Atsepoyi* to the case at hand is that Henry Wiley *was in the zone of danger* as plead by Plaintiffs. NIED claims fail when no actual danger is alleged. The *Atsepoyi* Court said that headaches and vomiting were *insufficient to create a zone of danger.*

As the Supreme Court explained:

> Perhaps based on the realization that "a near miss may be as frightening as a direct hit," the zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct. That is, "**those within the zone of danger of physical impact can recover for fright, and those outside of it cannot**."

*Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 547–48 (1994)(citations omitted)(emphasis added)

This is not to say that a zone of danger eliminates all other factors, just that it is one threshold condition and it impacts the analysis of the conditions that remain. A jury must still conclude that the "defendant's negligence created an unreasonable risk of physical harm and caused plaintiff to be put in fear for her own safety, that her fear must have had physical consequences or resulted in long-continued emotional disturbance, and that plaintiff's fear must have been the cause of the damages she claimed." *Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631, 638 (Colo. App. 1998).

Importantly, *Colwell* says "physical consequences **OR** long-term continued emotional disturbance" *Id.*(emphasis added).  When the fright results in physical consequences, the effects do not need to be long-term for a claim to succeed.  The *Colwell* Plaintiff in fact prevailed with very short-lived physical consequences. *Id*. at 639 ("in the days following the fire, she experienced such conditions as nausea, double vision, and lightheadedness. Accordingly, the trial court did not err in refusing to grant defendant's motion for a directed verdict.")

As Henry Wiley will testify, and someone who is not asthmatic may not fully understand, the symptoms suffered by the *Colwell* plaintiff sound pleasant indeed compared to a fear of impending suffocation – the physical sensation of lungs being strapped in iron bands and a windpipe that feels as narrow as a drinking straw.  Henry experienced this torture for hour after long hour, never knowing if the drinking straw would collapse with his next pull.

It bears repeating that Henry was *literally in danger of death*.  His many hospital trips were not frivolously precautionary: they were EMERGENCIES.  Why did he not declare an emergency?  Henry will testify and every asthmatic knows:  if one starts giving into the panic, they lose the battle...they bring on the full attack.  His safest course was to sit there and try to calm himself, not to make a scene...and especially not make a scene when he may only receive an unsympathetic response.

The Defendants' actions in refusing to allow the return of Henry's nebulizer placed Henry in significant danger, and Henry felt this danger acutely.  The fear this caused in Henry started a feedback loop that increased his physical manifestations and consequently increased his fear.  The subjection of Henry to this unreasonable distress and fear for the duration of the flight and for the duration of his travel to reach his nebulizer thereafter forms the basis of his claim.  It should not be dismissed.

**Plaintiff Smithers' Intentional Infliction of Emotional Distress (IIED) Claim is Sound**

Defendants in their motion have correctly stated the elements of IIED in Colorado but from there it seems like their research carries on in a parallel dimension to that of the Plaintiffs. The cases Defendant cites where courts have rejected the claim are sparse in the record and universally share weakly compelling factual patterns, while there are numerous examples of Colorado courts allowing the tort to proceed with behavior far less outrageous and mental suffering far less intense than the facts allege in the Complaint at hand.

### 1. *Defendants' Conduct was sufficiently outrageous and intolerable*

In *Donaldson v. Am. Banco Corp.*, 945 F. Supp. 1456, 1465–66 (D. Colo. 1996), a series of derogatory comments made by a female supervisor to two female employees about their pregnancies was sufficiently outrageous and intolerable.[2]  The behavior, while rude in a crudely joking sort of way, caused  no danger and no fear for their own safety or that of their children.

In *Han Ye Lee v. Colorado Times, Inc*., 222 P.3d 957, 964 (Colo. App. 2009), it was sufficiently outrageous that a newspaper did not verify a source before printing that a woman had skipped her husband's murder trial, leaving the impression that she had moved on very quickly.

In *Makeen v. Hailey*,  381 P.3d 337, 345 (2015), a Colorado Court of Appeals case, the court upheld a trial court determination of sufficiently outrageous conduct, where the court gave determinative weight to the fact that the guilty individual had sent a settlement letter where he

---

[2] This case was extensively and inaccurately cited in Defendants' prior motion, leading counsel to conclude that the error was detected in the preparation of the current version.  Lest there be any confusion, Courts may not find as a matter law that behavior is insufficiently outrageous after already determining that reasonable jurors could determine that it is.

stated that he did not care about the outcome of the case but intended to bankrupt (the plaintiff) in the process.

In *Meiter v. Cavanaugh*, 40 Colo. App. 454, 457, 580 P.2d 399, 401 (1978), it was sufficiently outrageous to call a woman visibly bandaged from cancer surgery a "sick old woman," along with "general belligerence" and the assertion that as an attorney he (the defendant) would have special influence in any judicial proceeding.  The *Meiter* Court found it significant that there were multiple acts of unkindness and opined:  "while any one of these acts might be considered an isolated unkindness or insult which would not survive a motion for a directed verdict, we cannot say the same for the combination. Since reasonable men could differ on the question of whether this series of acts was 'outrageous,' the trial court was correct in denying defendant's motions for a directed verdict and judgment notwithstanding the verdict."

The *Meiter* approach is particularly useful to apply to the case at hand and is supported by additional authority.  *Murphy v. Lowes Companies, Inc*., 2018 WL 2563408, at *3 (D. Colo. June 4, 2018) ("To determine whether a plaintiff has alleged behavior that is outrageous as a matter of law, the trial court must analyze the totality of the defendant's conduct.");  *Luna v. City & Cty. of Denver*, 537 F. Supp. 798, 799 (D. Colo. 1982)(" it is the totality of conduct that must be evaluated to determine whether outrageous conduct has occurred.")

Was it outrageous and intolerable that Ms. Smithers was kicked off the flight for exercising her Constitutional right of free speech to send out a tweet? It was outrageous, but maybe  not rising, alone, to the threshold of a viable claim of IIED.  Was it outrageous and intolerable that defendants falsely informed the juvenile Plaintiffs – and all the other passengers - that their mother had committed a felony and was going to jail?  That fact, standing alone, is enough to make a reasonable bystander pretty outraged, but courts could go either way on

whether the outrage would be reasonably sufficient to meet the high threshold for an IIED action. But when one hears of the arbitrary and malicious refusal to allow a minor child his critically important medication, the outrage boils up and over with ease at this incident alone.  If this act of inhumanity and callous indifference is not "intolerable," then what is?  Assuredly, if Thomas had suffered an asthma attack on that flight and died, the gate agent who had refused him his medication would have been rightly branded a monster in every major news outlet.

It would be hard to find a reasonable person who would NOT think it outrageous to prevent a mother returning critical medical equipment to her son.  As a matter of law it should not be difficult for a court to conclude that *at least some* reasonable persons could find this conduct sufficiently outrageous.  *Donaldson v. American Banco Corp. Inc*., 945 F. Supp. 1456, 1465-66 (D. Colo. 1996).

When all three outrageous actions are viewed in totality, not to mention that one of the employees violated Ms. Smithers dignity by striking her and telling her to "shut up," (ECF 36 at ¶32) it is readily apparent that reasonable people could conclude that the sum of Defendants' behavior towards Ms. Smithers is utterly, sufficiently, and intolerably outrageous and supports a finding of intentional infliction of emotional distress.

### 2. *Plaintiff Smithers suffered Sufficiently Severe Mental Distress*

Defendants use as their centerpiece citation for the proposition that Plaintiff Smithers did not suffer sufficiently as a matter of law, *Martensen v. Koch*,  2014 WL 3057172, at *8 (D. Colo. July 7, 2014).  However, this District Court case is not a good example of Colorado jurisprudence, *especially as Defendants have presented it.*  The strongest language that Defendants cite as *Martensen* opinion was language from a Kansas case  and the *Martensen*

Court made no indication that it was adopting it: it was offered as comparison to another case with a more lenient view:

> Such allegations are general and conclusory. Plaintiff does not allege when he began to suffer anxiety or depression, when he ceased to sleep, when the consequences of these events impacted him, or how he was impacted. However, even more specific allegations of these maladies likely would not suffice for a finding of liability. **Compare** *Patterson v. City of Wichita, Kan.*, NO. 12–CV– 1308–JAR, 2014 WL 2533180, at *11 (D. Kan. June 5, 2014) ("There is no laundry list of what qualifies as the requisite level of severity [of emotional distress].... [I]t is fair to say that headaches, sleeplessness, irritability, anxiety, depression, listlessness, lethargy, intermittent nightmares, and the like would probably not suffice anywhere.") (quoting Boston, Kline, & Brown, Emotional Injuries: Law and Practice § 22:7 (1998)), **with** *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1181–82 (10th Cir.2013) (holding a material issue of fact existed where Plaintiff filed an affidavit detailing his physical condition prior to defendant's negative credit reporting and detailed the exacerbated symptoms of his depression, anxiety, and Chron's Disease following the negative reporting, which he supported with medical records).

> *Id*. (emphasis added).

Kansas is not the *lex loci delicti* in this case, and the Kansas tort of IIED is differently constructed and differently treated by Kansas courts. In the latter, and more lenient, half of the comparison couplet cited in *Martensen*, the Tenth Circuit cites a Fourth Circuit case in support of its less stringent approach:

> Viewing Plaintiff's affidavit in the light most favorable to him and drawing all reasonable inferences in his favor, as we must, we conclude Plaintiff has provided sufficient evidence he suffered emotional damages as a result of the Ocwen Defendants' actions. See *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir.2009) (concluding the plaintiff "sufficiently articulated and demonstrated the emotional distress she experienced as she attempted to correct [the credit reporting service's] errors" **where she "presented evidence that her mental distress manifested itself as headaches, sleeplessness, skin acne, upset stomach, and hair loss").**

> *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1181–82 (10th Cir.2013)(emphasis added).

This Court need not consider *Martensen* in any capacity, however, as it is an outlier to Colorado jurisprudence.[3]  The large majority of Colorado courts do not pay great attention to the severity prong.

In *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1543 (D. Colo. 1992) a racially hostile work environment was sufficiently outrageous and the court made no consideration of the severity of the distress.

In *Makeen*, P.3d at 45, the Court found sufficient mental distress by the Plaintiff's testimony that the "lawsuit was worse than the passing of his wife."

In *Han Ye Lee,* 222 P.3d at 964, the Colorado Court of Appeals paid scant attention to the mental distress component of the tort, remarking only: "Lee alleged that, as a result, her reputation within the Korean community was damaged and she suffered severe emotional distress."  The claim survived.

In *Meiter*,  the Colorado Court of Appeals made no mention of the distress that the Plaintiff actually suffered.  The claim survived.

 In *Donaldson*, 945 F. Supp. At 1466, the court cites as evidence of sufficient emotional distress that Donaldson's husband claimed she was "upset," "very irritable," "concerned about her job," "mad," "very emotional," "crying," "and "embarrassed."  She also felt "humiliated" after one comment.  The other employee whose claim survived said that she cried on several occasions, that she was "tense," "stressed," "uncomfortable," and "very troubled."

In *Rugg v. McCarty*,  476 P.2d 753, 756 (1970), the Colorado Supreme Court made no mention of distress when it overturned a lower court ruling and held that a creditor's harassments

---

[3] Possibly because the facts are not compelling:  it is a millionaire executive complaining about millionaire problems.

for payment were sufficiently outrageous for the tort to survive, when the creditor was contacting the employer about garnishments even though the creditor did not have a judgment.

The Tenth Circuit offered a potential insight into why many courts do not focus extensively on the severe emotional distress prong: "'The intensity and the duration of the distress are factors to be considered in determining its severity.' Moreover, although severe distress must be proved, '*in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.*'" *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 856 (10th Cir. 2005)(quoting *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1378 (1978)(emphasis added).

Emotional distress is by its very nature *what happens on the inside.* There is no bleeding wound to assess. Ms. Smithers has alleged that the severity of her distress was terrible and still is terrible. Defendants can offer no evidence to the contrary at this stage to strip her of the presumption to which she is entitled. Ms. Smithers is being treated for PTSD. To be diagnosed with PTSD a medical professional measures concrete and recurring severe instances of distress. Defendants have no basis or footing at this stage to impugn the medical competence of Ms. Smithers' doctor.

Furthermore, the Defendants seek to focus the Court's attention solely upon the long-term severity and duration of Ms. Smithers' distress, but Defendants support this singular approach with no case law and the Tenth Circuit does not agree. (See, *Aguilar,* supra.) One could imagine a scenario where a person falsely tells a mother that her child has just been run over and killed and then lets her believe it for a full 10 minutes. The intense trauma of those 10 minutes could easily be determined by a jury to be sufficient to support a claim of IIED.

Defendants caused Ms. Smithers to believe that she was going to be thrown in jail – for a felony, no less. One can imagine the depth of this law-abiding woman's horror. Then she is given the additional agony of wondering if her youngest son might have a terrible attack, might even die – already blaming herself, even though it wasn't her fault. This was a terrifying and traumatic experience for everyone, and asthmatics *don't do well with stress*. "Stress and Asthma," https://www.webmd.com/asthma/guide/stress-asthma#1, accessed Sept. 27, 2018, ("Asthma, stress, and anxiety make for a vicious circle, and one that can spiral downward quickly.") Of course, Ms. Smithers knew the things that would trigger and intensify her son's attacks. If the after-tremors of such an ordeal are enough to leave a woman meeting with a therapist for PTSD then *how severe must the distress have been at the time?* This is a question for the jury – not the Defendants – to answer. Plaintiff Smithers has laid out a valid claim for intentional infliction of emotional distress and it should not be dismissed.

**Conclusion**

All of Defendants' arguments fail for the reasons set forth above.

Respectfully Submitted,

     /s/ Thatcher A. Stone

Thatcher A. Stone (admitted PHV)

     /s/ William T. Woodrow III

William T. Woodrow III (VSB 88122)
Stone & Woodrow LLP
250 West Main Street, Suite 201
Charlottesville, VA 22902
Email:   thatcher@stoneandwoodrowlaw.com
       will@stoneandwoodrowlaw.com
Phone: (855) 275-7378
*Attorneys for Plaintiffs*

## **Certificate of Service**

I hereby certify that on November 28, 2018 I electronically filed a true and correct copy of the foregoing document with the CM/ECF system, which will send a notification of such filing to the following:

Elaine Charlson Bredehoft, VSB No. 23766
Charlson Bredehoft Cohen & Brown, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
ebredehoft@cbcblaw.com
Counsel for Defendants
Frontier Airlines, Inc. and
Aircraft Services International, Inc.


Charlottesville, VA          November 28, 2018

By:___/s/ William T. Woodrow_____

William T. Woodrow III, Esq.
Stone & Woodrow LLP
Suite 201, Lewis & Clark Plaza
250 West Main Street
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Telephone +1 855 275 7378/Fax +1 646 873 7529
Stone & Woodrow LLP is a Virginia Registered Limited Liability Partnership
*Counsel for Plaintiffs*