# ATTACHMENT 4

## Dkt. 67

## Frontier's Opposition to
## Plaintiffs' Motion to Compel Discovery

## STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

### ANNEX B2.0 – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 7001 Tower Road<br>Denver, CO 80249 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Simplicity Ground Services, LLC** |
| having its principal office at: | 2520 West Airfield Drive, Suite 100<br>P.O. Box 610330<br>Dallas-Fort Worth Airport, TX 75261 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | August 22, 2016 |
| This Annex B2.0 for | |
| the location(s): | Denver International Airport (the "Airport" and "DEN") |
| is valid from: | August 22, 2016 |
| and replaces: | N/A |

### PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

Frontier Form of ANNEX B; 2016; DEN

DEF-000157

## PARAGRAPH 1. HANDLING SERVICES AND CHARGES

1.1.    For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 1. REPRESENTATION, ADMINISTRATION AND SUPERVISION

**1.1    Representation**
1.1.2    Liaise with local authorities.
1.1.3    Indicate that the Handling Company is acting as handling agent for the Carrier.
1.1.4    Inform all interested Parties concerning schedules of the Carrier's aircraft.

**1.2    Administrative Functions**
1.2.1    Establish and maintain local procedures.
1.2.2    Take action on communications addressed to the Carrier.
1.2.3    Prepare, forward, file and retain for a period specified by the Carrier (not less than ninety (90) days), messages/reports/statistics/documents and perform other administrative duties in the following areas
(a) station administration
(b) passenger services
(c) ramp services
(d) load control
(e) flight operations
(h) support services
(k) other: training records (retain for at least one (1) year after the completion of services for the Carrier at Airport)
1.2.4    Maintain the Carriers manuals, circulars, and other relevant operational documents connected with the performance of the services.
1.2.5    (c) Forward
on behalf of the Carrier items including, but not limited to, invoices, supply orders, handling charge notes, work orders.

**1.3    Supervision and/or Coordination**
1.3.1    (a) Supervise
(b) Co-ordinate
services contracted by the Carrier with third party(ies)
1.3.2    Provide Turnaround coordinator (TRC)
1.3.3    Ensure that the third party(ies) is(are) are informed about operational data and Carrier's requirements in a timely manner.
1.3.4    Liaise with the Carrier's designated representative
1.3.5    Verify availability and preparedness of personnel, equipment, Loads, documentation of third party(ies).
1.3.6    Meet aircraft upon arrival and liaise with crew.
1.3.7    Decide on non-routine matters.
1.3.8    Verify dispatch of operational messages.
1.3.9    Note irregularities and inform the Carrier.

DEF-000158

**1.4 Station Management**

1.4.1   Provide representative on behalf of the Carrier to act
    (b) non-exclusively

1.4.3   Attend local airport meetings on behalf of the Carrier
    (a) report to the Carrier results/contents of the meetings.

1.4.7   Perform and report quality/performance measurements

1.4.8   Handle the contents of Carrier's company mail pouches

**SECTION 2. PASSENGER SERVICES**

**2.1   General**

2.1.1   Inform passengers and/or public about time of arrival and/or departure of Carrier's aircraft and surface transport.

2.1.2   Make arrangements for stopover, transfer and transit passengers and their baggage and inform them about services available at the airport.

2.1.3   When requested by the Carrier,
    (a) provide
    special equipment, facilities and specially trained personnel, for assistance to
    1.  unaccompanied minors.
    3.  VIPs.
    4.  transit without visa passengers (TWOVs).
    5.  deportees.
    6.  special medical transport.
    7.  others, as specified by the Carrier.
    (b) arrange for
    Special equipment, facilities and specially trained personnel, for assistance to
    (2) persons with reduced mobility (PRMs)

2.1.4   (a) Provide for
    passenger assistance when flights are interrupted, delayed or cancelled.  Such assistance shall include:
    (1) Meal vouchers
    (2) Rebooking
    (3) Transportation
    (4) Hotel accommodation
    (5) Personnel

2.1.5   If applicable, arrange storage of baggage in the bonded store (any fees to be paid by the passenger)

2.1.6   (a) Notify the Carrier of complaints and claims made by the Carrier's passengers.

2.1.7   Report to the Carrier any irregularities discovered in passenger and baggage handling.

2.1.8   (b) Arrange for
    (1) check-in counter(s)/position(s)
    (5) set up of the Carrier's specific items, such as but not limited to carpets, mobile signage, queuing control stanchions
    (6) other facilities as specified by the Carrier

2.1.9   Perform the following ticketing/sales functions
    (a) reservations
    (b) issuance of transportation documents
    (c) ancillary services/sales
    (d) e-ticketing

DEF-000159

(e) other as specified by the Carrier

**2.2 Departure**
**2.2.1** Perform pre-flight editing
**2.2.2** Check and ensure
  (a) that tickets are valid for the flight(s). The check shall not include the fare.
  At the following locations:
  (1) check-in area
  (4) gate
  (6) other locations specified by the Carrier
**2.2.3** (a) Check travel documents for the flight(s) concerned. In the event that the Handling Company does not have access to information that verifies visa validities the Handling Company will not have liability. The Handling Company shall not be liable for immigration fines in the event of non-bona fide travel documents or other events which are outside of their control.
  (b) Enter required passenger and/or travel document information into Carrier's and/or government system.
  At the following locations:
  (1) check-in area
  (4) gate
  (6) other locations specified by the Carrier
**2.2.4** (a) Weigh and/or measure checked and/or cabin baggage
  (b) Record baggage figures for
  1. initial flight..
  2. subsequent flight(s).
  At the following locations:
  (a) check-in area
  (d) gate
  (f) other locations specified by the Carrier
**2.2.5** Excess baggage
  (a) determine excess baggage
  (b) issue excess baggage ticket
  (c) collect excess baggage charges
  (d) detach applicable excess baggage coupons
  At the following locations:
  (1) check-in area
  (4) gate
  (6) other locations specified by the Carrier
**2.2.6** Tag
  (a) checked baggage
  (b) cabin baggage
  for
  (1) initial flight.
  (2) subsequent flight(s).
  At the locations:
  (a) check-in area
  (d) gate
  (f) other locations specified by the Carrier
**2.2.7** Effect conveyance of checked baggage to the baggage sorting area
  At the following locations:

DEF-000160

  (a) check-in area
  (d) gate
  (e) other locations specified by the Carrier

2.2.8 Effect conveyance of Out of Gauge (OOG)/oversized checked baggage to the baggage sorting area
  At the following locations:
  (a) check-in area
  (d) gate
  (e) other locations specified by the Carrier

2.2.9 Collect airport and/or any other service charges from departing passengers
  At the following locations:
  (a) check-in area
  (d) gate
  (e) other locations specified by the Carrier

2.2.10 (a) Carry out the Carrier's seat allocation or selection system
  (b) Issue boarding pass(es)
  (c) Detach applicable flight coupons
  for
  1. initial flight
  2. subsequent flight(s)
  At the following locations:
  (a) check-in area
  (d) gate
  (f) other locations specified by the Carrier

2.2.11 Handle
  (a) Denied Boarding process
  (b) Denied Boarding Compensation
  At the following locations:
  (1) check-in area
  (4) gate
  (5) other locations specified by the Carrier

2.2.12 Direct passengers
  (a) through controls to departure gate

2.2.13 Handle upgrade/downgrade functions
  At the following locations:
  (a) check-in area
  (d) gate
  (e) other locations specified by the Carrier

2.2.14 Handle standby list
  At the following locations:
  (a) check-in area
  (d) gate
  (e) other locations specified by the Carrier

2.2.15 At the gate perform
  (a) verification of cabin baggage
  (b) boarding process
  (c) reconciliation of passenger numbers with aircraft documents prior to departure
  (d) other gate functions as specified by the Carrier

2.2.16 (a) collect

DEF-000161

(b) reconcile
(c) handle
and forward to Carrier transportation documents (flight coupons, or other flight related documents) uplifted from departing passengers

2.2.17 Perform post-flight editing

**2.3    Arrival**
**2.3.1**  (a) perform
opening/closing aircraft passenger doors
**2.3.2**  Direct passengers
(a) from aircraft through controls
**2.3.3**  (a) Provide
(1) Transfer counter
(2) Connection services
(3) Baggage recheck
**2.3.4**  Handle lost, found and damaged property matters.
(a) Provide
(1) acceptance of baggage irregularity reports
(2) entering of data into baggage tracing system
(3) maintaining baggage tracing system files for at least one (1) year
(4) making payment for incidental expense
(6) handling of communications with passengers
(b) Arrange for
(5) delivery of delayed baggage to passengers
(7) repair or replacement of damaged baggage

**PASSENGER SERVICES NOTES:**
- Ticket counters must open at least two (2) hours prior to scheduled departure and remain continually staffed until departure.
- Gates must open at least one (1) hour prior to scheduled departure, or fifteen (15) minutes prior to scheduled arrival, whichever is greater.
- Baggage claim carousels and Baggage Service Offices must be staffed from the time of aircraft arrival until at least fifteen (15) minutes after all baggage is delivered, all carousels are cleared of baggage, and all missing baggage claims are completed and filed in the Carrier's electronic system.

**SECTION 3. RAMP SERVICES**
**3.1    Baggage Handling**
**3.1.1**  Handle baggage in
(a) the baggage sorting area
(b) other locations as specified by the Carrier
**3.1.2**  Prepare for delivery onto flights
(a) bulk baggage
**3.1.3**  Establish the number and/or weight of
(a) bulk baggage *(keep track of heavy bags separately)*
and provide the load control unit with the information
**3.1.4**  Offload
(a) bulk baggage
**3.1.5**  Prioritize baggage delivery to claim area
**3.1.6**  Deliver to claim area

DEF-000162

         (a) baggage
         (b) Out of Gauge (OOG)/oversize baggage

**3.1.7**   Transfer baggage
         (a) Provide
         (1) sortation of transfer baggage.
         (2) storage of transfer baggage prior to dispatch.
         (3) transport of transfer baggage to the sorting area of the receiving carrier.

**3.1.8**   Handle crew baggage

**3.2**    **Marshalling**
**3.2.1**   (a) Provide
         marshalling at arrival and/or departure.
**3.2.2**   Operate automated guidance systems

**3.3**    **Parking**
**3.3.1**   (a) Provide
         (b) Position and/or remove
         wheelchocks
**3.3.2**   (a) Provide
         (b) Position and/or remove
         (6) safety cones
         (7) other items as specified by the Carrier

**3.4**    **Ancillary Items**
**3.4.1**   (a) Provide
         (c) Operate
         (1) Ground power unit
         (2) Fixed ground power
         (3) Cooling unit
         (4) Heating unit
         (5) Air start unit

**3.5**    **Ramp to Flight Deck Communication**
**3.5.1**   Provide headsets.
**3.5.2**   Perform ramp to flight deck communication
         (a) during push-back.
         (b) during tow-in.
         (c) during engine starting
         (d) for other purposes

**3.6**    **Loading and Unloading**
**3.6.1**   (c) Operate
         (1) passenger steps.
         (3) loading bridges.
**3.6.3**   (a) Provide
         (c) Operate
         equipment for loading and/or unloading.
**3.6.4**   (a) Provide
         delivery and pick-up of
         (1) Baggage

DEF-000163

(2) Mobility devices
at aircraft doors or other agreed points

3.6.5 (a) Provide
assembly and transport of
(1) baggage
(5) documents
(6) company mail
between agreed points on the airport

3.6.6 (a) Unload aircraft, returning lashing materials to the Carrier.
(b) Load and secure Loads in the aircraft.
(c) Redistribute Loads in the aircraft.
(e) Report final load distribution to the Load Control unit.

3.6.7 Open, close and secure aircraft hold doors
(a) aircraft lower deck

3.6.9 (a) Provide
safeguarding of all Loads requiring special handling (e.g., valuables) during
1. loading/unloading
2. transport between aircraft and designated point on the airport

**3.7    Safety Measures**

3.7.1 (a) Provide
(1) portable fire extinguisher on motorized/self-propelled ramp equipment
(provided by the Carrier)
(2) ramp fire extinguisher, if not provided by airport authority, to be provided
by the Carrier
(b) arrange for
(1) attendance of airport fire services at aircraft

3.7.2 Perform visual external safety/ground damage inspection of
(a) doors and panels and immediate surroundings
(b) other inspection items as specified by the Carrier
(1) immediately upon arrival
(2) immediately prior to departure
and communicate the results to flight crew and the Carrier's representative

3.7.3 Check that all doors and access panels are properly closed and locked

**3.8    Moving of Aircraft**

3.8.1 (a) Provide
(1) tow-in and/or push-back of aircraft
(2) towing of aircraft between other points
(4) wing-walkers

3.8.2 (a) Towbar to be provided by the Carrier
(c) Store and maintain towbar(s) provided by the Carrier

**3.11    Toilet Service**

3.11.1 (a) Provide
(1) servicing (empty, clean, flush and replenish fluids)
(2) triturator/disposal service

**3.12    Water Service**

3.12.1 (a) Provide

DEF-000164

(1) draining tanks
(2) replenish tanks (water standard as specified by the Carrier)
(3) water quality tests

**3.15    Catering Ramp Handling**
**3.15.1** Load/deliver bags of ice to cabin entry on request

**RAMP SERVICES NOTES:**
Minimum ramp staffing (each properly trained and current) within the aircraft
footprint:
- A319/A320:    3 per flight
- A321:    4 per flight

**SECTION 4. LOAD CONTROL AND FLIGHT OPERATIONS**
**4.1    Load Control**
**4.1.1** Deliver load control related documents between the aircraft and appropriate
airport buildings and vice versa.
**4.1.2** (a) Process
(b) Sign
Documents and information, including but not limited to, loading instructions,
load and trim sheets, Captain's load information and manifests where:
(2) Handling Company is performing inputs/updates when Load Control is
performed by the Carrier or third party

**4.2    Communications**
**4.2.1** Inform all interested parties concerning movements of the Carrier's aircraft.
**4.2.2** (a) Compile, receive, process and send all messages in connection with the
services performed by the Handling Company. The Handling Company is
authorized to use the Carrier's originator code or double signature
procedure
(b) Inform the Carrier's representative of the contents of such messages
**4.2.3** (a) Provide
(b) Operate
means of communication between the ground station and the Carrier's aircraft
(at all times while the aircraft are on the ground and when the aircraft are in the
air and within VHF range).

**4.3    Flight Operations**
**4.3.1** Inform the Carrier of any known project affecting the operational services and
facilities made available to its aircraft in the areas of responsibility as specified
in Annex B.
**4.3.2** (b) Arrange for
meteorological documentation and aeronautical information
(1) at the airport locations(s) as defined in this Annex B
**4.3.3** (a) Provide
Delivery of flight operations related documentation to the aircraft and obtain
signature of the pilot-in-command, where applicable
(1) At the airport location(s) as defined in this Annex B
**4.3.4** (a) Analyse the operational considerations
(b) Request

DEF-000165

make available the operational flight plan according to the instructions and data provided by the Carrier
(1) at the airport locations(s) as defined in this Annex B

4.3.7   Provide the crew with a briefing

4.3.8   (c) Deliver
(1) the fuel order
(2) the fuel distribution form

4.3.9   Provide ground handling party(ies) with weight and fuel data

4.3.10  Obtain a debriefing from incoming crews, distributing reports or completed forms to offices concerned.

4.4     **Crew Administration**

4.4.1   Distribute crew schedule information provided by the Carrier to all parties concerned.

4.4.4   Direct crews through airport facilities

4.4.7   Inform the Carrier representative of any crew indisposition or potential absence.

**SECTION 6. SUPPORT SERVICES**

6.2     **Automation/Computer Systems**

6.2.1   (c) Operate
Computer hardware and other equipment, as directed by the Carrier, to enable access to
(1) Carrier's system

6.2.2   Perform the following functions in
(a) Carrier's system
(b) Handling Company's system
for
(1) Training
(2) Passenger reservations and sales
(3) Passenger service
(4) Baggage reconciliation
(5) Baggage tracing
(6) Operation, load control
(10) Maintenance reporting
(11) Other functions

6.2.3   Manage Automated Check-in device(s) and
(a) Provide
(1) Stock control
(2) Stock replenishment
(b) Arrange for
(4) Routine maintenance
(5) Servicing and repair
(6) Other as specified by the Carrier

6.5     **Ramp Fuelling/Defueling Operations**

6.5.1   Liaise with ramp fuel suppliers

6.5.8   Check and verify the delivered fuel quantity

6.5.9   Deliver the completed fuel order to the Carrier's designated representative

DEF-000166

**6.7    Catering Services — Liaison and Administration**
**6.7.1**    Liaise with the Carrier's catering supplier

## SECTION 7. SECURITY

**7.1    Passenger and Baggage Screening and Reconciliation**
**7.1.1**    (a) Provide
    1.  matching of passengers against established data
    2.  security questioning
**7.1.2**    (b) Arrange for
    1.  screening of checked baggage
    2.  screening of transfer baggage
    3.  screening of mishandled baggage
    4.  physical examination of checked, transfer and mishandled baggage
    5.  identification of security cleared baggage
**7.1.3**    (b) Arrange for
    1.  screening of passengers
    2.  screening of cabin/unchecked baggage
    3.  physical examination of passengers and cabin/unchecked baggage
**7.1.4**    (a) Provide
    1.  identification of passengers prior to boarding
    2.  reconciliation of boarded passengers with their baggage
    3.  positive baggage identification by passengers
    4.  offloading of baggage for passengers who fail to board the aircraft

**7.4    Ramp**
**7.4.1**    (a) Provide
control of access to
    (1) aircraft
    (2) designated areas
**7.4.2**    (a) Provide
    (1) searching of (aircraft exterior only)
    (2) guarding of
    (3) sealing of
    (a) aircraft
    (b) designated areas
    (c) baggage in the baggage make-up area

## GROUND SERVICE EQUIPMENT AT AIRPORT

The Carrier shall supply and maintain, at its own expense sufficient quantities of Ground Service Equipment (GSE) to perform the Services. The Handling Company shall operate and fuel the GSE at its own expense. Damages/repairs necessitated due to other than normal wear and tear shall be at the Handling Company's expense, where demonstrably caused by the actions of the Handling Company. The Handling Company shall not utilize the GSE for the performance of services to any other airline or company during the Term of this Agreement.

At some point during the Term of this Agreement, the Parties may mutually elect to transfer ownership of the GSE from the Carrier to the Handling Company. Any such transfer of ownership shall be documented via a fully executed written amendment to this Agreement. Should such a transfer of ownership take place the further rights and

DEF-000167

obligations of the Parties as they pertain to GSE at the time of this Agreement's expiration/termination are more particularly described in Paragraph 15, below.

**CARRIER LEASED PROPERTY AT AIRPORT**
The Handling Company will be allowed use of the Carrier's leased property/facilities (for providing services to the Carrier only and not in any way associated with the provisioning of services to other parties), which may change from time to time, at Airport at no additional charge and shall keep said property/facilities clean, neat, orderly, and maintained at the Handling Company's sole expense. Costs to repair or refurbish Carrier's leased property/facilities as a result of failure to clean or maintain, negligence, damage or neglect caused by the Handling Company will be the sole responsibility of the Handling Company.

1.2.    Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows and shall remain fixed for the Initial Term except where specifically permitted by this Annex B pursuant to the Average Daily Turns Scheduled per Month (as defined below) volumes falling below 47 or increasing above 76 OR pursuant to Paragraph 1.9:

|  | Average Daily Turns (arrival and subsequent departure) Scheduled per Month | | | | | |
|---|---|---|---|---|---|---|
|  | <46 | 46 to <51 | 51 to <57 | 57 to 67 | >67 to 76 | >76 |
| A319/A320 | GFN* | | | | | GFN* |
| A321 | GFN* | | | | | GFN* |

*The Parties will negotiate in good faith to determine appropriate rate(s) for such volumes.

Note 1: On the second year anniversary of this Agreement, the Parties will discuss in good faith whether a CPI adjustment (up or down) to the wage component only of the above rates is proper and if so, what the revised rates will be for the remainder of the Initial Term.

Note 2: The Carrier will pay the Handling Company at the below hourly labor rates during the transition of the Carrier's operation at DEN. At the time that the Handling Company takes over all handling services, estimated to be on or about September 17, 2016, the Carrier will then begin paying based on the Average Daily Turn rates stated above.

Note 3: The above pricing is based on agreed to staffing levels as further outlined in Attachment B. Should the Carrier seek a long term modification to said staffing levels, the Parties will adjust the above Turn Rates and capture both the revised Turn Rates and revised staffing levels via a written amendment to this Annex B.

"Average Daily Turns Scheduled per Month" = Scheduled Departures / Days in Calendar Month.

*Recurring Monthly Costs*
These Recurring Monthly Costs (Start-up Costs and GSE/GSE Mix Costs (if any)) will be tallied and finalized by the Parties and added to this Annex B via an amendment executed by both Parties on or before November 16, 2016. Additionally, these Recurring Monthly Costs will be invoiced beginning with the first December, 2016 invoice and distributed evenly over the remainder of the Initial Term.

   i. Start-up Costs: The one-time costs associated with the Handling Company starting to perform services at DEN, a location where it did not previously

DEF-000168

provide any services to the Carrier, to be tallied, reviewed and confirmed by the Carrier, and formally stated via a signed amendment to this Agreement, with sub-totals not to exceed the following amounts per approved category:

Recruitment, badging, advertising, medical:  $
Start-up Team/TDY Support:  $
Training:  $
Uniforms:  $
Radios:  $
Ramp Supplies:  $
General:  $

2. *GSE/GSE Mix Costs*:

*To be revised via a fully executed written amendment to this Agreement should the Carrier transfer ownership of any GSE to the Handling Company.

**Additional Costs**

Aircraft relocation tow (one way):
GPU (when gate power not available):  per 15 minutes
Cooling & Heating (when gate air not available):  per 15 minutes
Additional labor hours requested by the Carrier or necessitated due to the Carrier's delays of more than 45 minutes*:

Agent:       Base: $   per hour
             Overtime: $   per hour*
Lead Agent:  Base: $   per hour
             Overtime: $   per hour
Supervisor:  Base: $   per hour
             Overtime: $   per hour

*Base rates shall only be charged to the extent the Handling Company pays extra hourly pay to an employee(s); Overtime rates shall only be charged to the extent the Handling Company pays overtime pay to an employee(s).

*Incentives and Credits* (Effective January 1, 2017)

The Carrier's goal is to establish reasonable and attainable targets that are clearly communicated to the Handling Company to establish a performance-based and results-oriented agreement to maximize operational results and benefit to both Parties.

1. Quarterly Performance

| | | Incentive / Discount | Range |
|---|---|---|---|
| **OT/TR Departure** | Exceeds | | |
| | Target | None | |
| | Low | Discount | |
| | Not Performing | Discount | |
| **AO Hard Starts** | Exceeds | Bonus | |
| | Target | None | |
| | Low | Discount | |

DEF-000169

| (Controllable) | Not Performing | Discoun⬛ ⬛⬛⬛ |
| STATION MBR | Exceeds | |
| | Target | None | ⬛⬛⬛ |
| | Low | Discoun⬛ |
| | Not Performing | Discoun⬛ ⬛⬛⬛ |

*Not eligible to receive if attributable damage in quarter.

2.  Monthly Performance

| | | Station Monthly Departures | | |
| | | <63 | 63-212 | >212 |
| AO Controllable Flight Delays | *>10 Minutes | | Discount Specific Flight(s) ⬛⬛ |
| Baggage | Each Flight with last bag > 30 Minutes | | Discount Specific Flight(s) ⬛ |
| Complaint(s) | Verified complaint re service* | | ⬛⬛⬛ er Occurrence |
| Station Audits / Events | Passed | | No Discount |
| | Failed | | Discount Mont⬛⬛⬛⬛ Consecutive Audit Fail is ⬛⬛ |
| | Repeat Findings – Controllable | | ⬛⬛⬛⬛ Repeat Finding |
| | Incomplete Training Records | | |
| | Improper Training | | |
| FOD Walks | Observed failure to conduct (pre or post flight) | | ⬛⬛ er Occurrence |
| Uniforms | Incomplete, dirty, untidy | | ⬛⬛ er Occurrence or Complaint after first notice, per employee |
| Minimum Staffing^ | Below Desired/Appropriate Level | | ⬛⬛ Day | ⬛⬛ Day | ⬛⬛ Day |
| Carrier Staffing | When due to short staffing, per flight, partially or completely staffed | | Discount Specific Flight(s) ⬛⬛ |

*The Handling Company will be afforded an opportunity to disprove any such complaints.

^The Handling Company may propose an alternative metric for the Carrier's consideration and possible adoption.

Note 1: Incentives and Credits to be reviewed by the Parties in early December 2016, prior to the January 1, 2017 start. The Parties will add a penalty to address Wait to Parks.

1.3.  Handling in case of technical landing for other than commercial purposes will be charged at 1.0% of the above rates, provided that a physical change of load is not involved.

1.4.  Handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.5.  Handling in case of return to ramp involving a physical change of load will be charged as for handling in case of technical landing in accordance with Sub-Paragraph 1.3 of this Annex.

DEF-000170

1.6. No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.7. Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

1.8 As set out in Sub-paragraph 1.2, the Carrier shall reimburse the Handling Company's Start-up Costs, with such costs being defined as the one-time costs associated with the Handling Company starting to perform services at DEN ("Start-up Costs"), a location where it did not previously provide any services to the Carrier. Start-up Costs will be reimbursed by the Carrier to the Handling Company in fixed monthly payments as set out in sub-paragraphs 1.2 and 8.1 effective from the fourth (4th) month's invoice following the Anniversary Date (as defined below) and shall be shown as a separate line item in the Handling Company's monthly invoice. In the event of the termination of this Agreement for any reason prior to the completion of the Initial Term then the Carrier shall immediately pay to the Handling Company within its final invoice the amount of the unamortized Start-up Costs at that date.

1.9 The Carrier agrees that, in the event the Handling Company becomes subject to any new mandated Federal, State, or Local Laws related to the required compensation, benefits or taxes to be paid in the employment of its personnel, and such laws require a justifiable increase to the Handling Company's cost of performing its services to the Carrier, then the Carrier agrees to enter into a good faith negotiation with the Handling Company for an adjustment in the Handling Company's charges, as set forth in this Agreement. Such negotiation will be based only on the recovery of the Handling Company's costs of such compensation, benefits or taxes. In the event that the Handling Company and Carrier shall be unable to agree on an appropriate adjustment, the current pricing shall continue, provided that either party shall be entitled to terminate this Annex B at any time thereafter in accordance with sub-paragraph 10.1.

## PARAGRAPH 2. ADDITIONAL SERVICES AND CHARGES

2.1. Any services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3. DISBURSEMENTS

3.1. Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge). The Handling Company has no obligation to make any disbursements on behalf of Carrier.

## PARAGRAPH 4. LIMIT OF LIABILITY AND INDEMNIFICATION

4.1 Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees,

DEF-000171

which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, except where such acts or omissions were instructed or authorized by Carrier in writing, including but not limited to:

    Death of or injury to any person or persons;

    False arrest, detention, imprisonment, searches or malicious prosecution;

    Libel, slander and/or defamation of character;

    Violations of the right of privacy; or

    The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors other than acts or omissions instructed or authorized by Carrier in writing subject to a limitation of $13,750.00 per violation."

4.2    The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any direct loss, cost, or damage incurred by Carrier resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B. Such liability shall not exceed ▉▉▉▉▉▉▉▉▉

4.3    UNLESS SPECIFICALLY PERMITTED BY THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF REVENUE OR LOST PROFITS, ARISING FROM ANY PROVISION OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND EACH PARTY HEREBY RELEASES AND WAIVES ANY CLAIMS AGAINST THE OTHER PARTY REGARDING SUCH DAMAGES.

## PARAGRAPH 5. INSURANCE

5.1    The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

Commercial General Liability: ▉▉▉▉▉▉ CC/AGG
    Premises: ▉▉▉▉▉▉ OCC
    Products & Completed Operations: ▉▉▉▉▉▉ CC
    Hangarkeepers: ▉▉▉▉▉▉ OCC

DEF-000172

Personal Injury:                                    
Contractual:
Automobile Liability:
Employer's Liability:
Workers' Compensation:

Per State/Federal Requirements,
but not less tha...

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1) The Carrier is included as an Additional Insured as their interests may appear.

2) All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3) This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5) In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6) Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1    The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: N/A.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1    Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party except with the prior written consent of the Carrier except in the case of GSE maintenance, in which case the Carrier's written consent may not be unreasonably withheld.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT.

8.1    In consideration for the Services the Handling Company will invoice Carrier on a twice monthly basis (days 1 through 15 of the calendar month and days 16 through the end of

Frontier Form of ANNEX B; 2016; DEN                               Page 17 of 28

DEF-000173

the calendar month) based on one-hundred percent (100%) of the scheduled turns at applicable rates for that volume of flights scheduled for that calendar month in accordance with the rates set out in sub-paragraph 1.2. On the first invoice of each month, reductions will be made for any scheduled turns on any day during the prior month that had been cancelled with at least 18 hours' advance notice. Invoices will include: (1) Start-up Costs, which shall be invoiced within the first invoice of each month, beginning with the first December, 2016 invoice and distributed evenly over the remainder of the Initial Term, (2) The number of turns to be charged (including offsets for cancellations) x the applicable Turn Rate for the month, (3) additional charges, if any, (4) additional reductions, if any, (5) bonuses earned, if any, from the previous quarter and (6) discounts due, if any, from the previous month/quarter.

8.2     Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH). The Handling Company's invoices shall include the following information for payment:

Bank Name: 

Ref: _____
Invoice Number(s): _____

8.3     With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier via email at apinvoices@flyfrontier.com. Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a twice monthly basis, as stated in Paragraph 8.1, above, and the Carrier shall pay the Handling Company within thirty (30) days of date of the Handling Company's invoice. The date of the Handling Company's invoice must be the date on which the Carrier receives the invoice. In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing. Both Parties shall then seek in good faith to resolve the disputed amount(s). Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

**PARAGRAPH 9. SUPERVISION AND ADMINISTRATION**

9.1     The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s): All Airport services.

**PARAGRAPH 10. DURATION, MODIFICATION, AND TERMINATION**

10.1     Duration

10.1.1     Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from August 22, 2016 through September 16, 2021 (the "Initial Term") and thereafter until terminated by either Party upon one hundred

DEF-000174

and twenty (120) days' prior written notice to the other Party (the "Term"). The anniversary date of this Agreement shall be September 17th of each year (the "Anniversary Date").

10.1.2 Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, the rates contained in Paragraph 1 shall remain in effect through the Initial Term except for circumstances specifically identified in this Annex B that permit the Parties to consider negotiating a modification to the pricing.

10.2    Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1 Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated in the following circumstances by the terminating Party providing one hundred and twenty (120) days' prior written notice (except for the termination pursuant to Paragraph 10.3.1(a)(i), below) to the other Party as follows:

    (a) by the Carrier in the event of:

        (i)    material and sustained failure by the Handling Company to achieve the service standards specified in sub-Paragraph 1.2 after providing no less than sixty (60) day's written notice of termination, which shall not be issued until after the Handling Company has first received written notice of such failure and the Handling Company has failed to cure such failure within thirty (30) days of having received such written notice of failure, or

        (ii)    inability of the Parties to agree, after good faith negotiations, to an adjustment of rates in accordance with the terms of this Annex B that specifically permit such an adjustment, or

        (iii)    failure by the Handling Company to perform its obligations under this Annex B, other than as specified in Article 11.8 of the Main Agreement, or

    (b)    by the Handling Company in the event of:

        (i)    inability of the Parties to agree, after good faith negotiations, to an adjustment of rates in accordance with the terms of this Annex B that specifically permit such an adjustment, or

        (ii)    failure by the Carrier to perform its obligations under this Annex B, other than as specified in Article 11.8 of the Main Agreement.

10.3.2 Notwithstanding 10.1 of this Annex B, should the Carrier terminate, suspend or cease operating to DEN, or in the event of a change of control occurring in the ownership of the Carrier such that its operations at DEN shall be materially affected, then this Annex B can be terminated by either Party on giving one hundred and twenty (120) days' written notice to the other.

10.3.3 In the event of the termination of this Annex B for any reason prior to the conclusion of the Initial Term, then the provisions of sub-paragraphs 1.8 and Paragraph 15 herein shall automatically apply.

**PARAGRAPH 11. NOTIFICATION**

DEF-000175

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 7001 Tower Road
> Denver, Colorado 80249
> U.S.A.
> Telephone: 720-374-4200
> Facsimile: Not Authorized for Notification
> Attn: General Counsel
> Attn: Director, Ground Handling Contracts
>
> To Handling Company:
> Simplicity Ground Services, LLC
> 2520 West Airfield Drive, Suite 100
> P.O. Box 610330
> Dallas-Fort Worth Airport, Texas 75261
> U.S.A.
> Telephone: 972-739-6623
> Facsimile: 972-739-0273
> Electronic Mail: philip.harnden@menziesaviation.com
> Attn: Corporate Secretary

## PARAGRAPH 12. GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13. FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

DEF-000176

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1    All working hours of the Handling Company's employees resulting from the Carrier's specific training requirements as reasonably required by the Carrier will be borne by the Handling Company.  Expenses resulting from specific training requirements by the Carrier will be borne by the Handling Company.

14.2    Training necessitated due to attrition shall be at the Handling Company's sole expense, which may include but not be limited to costs associated with a training site, employee hours, employee hotels, travel and employee per diem.

14.3    The Handling Company undertakes the responsibility to provide training(s) to its employees as per the Carrier's policy(ies).

14.4    The Handling Company undertakes the responsibility to establish and maintain six (6) or more "DEN Station Training Coordinators" (at least three (3) to provide above wing training and at least three (3) to provide below wing training) trained by and approved by the Carrier to provide hands on training, as well as at least one (1) or more "Corporate Trainers" trained by and approved by the Carrier to provide classroom training to the Handling Company's employees.  Such Station Training Coordinators and Corporate Trainers shall be in place within thirty (30) days of the start of this Agreement and shall be maintained throughout the Term of this Agreement with no more than a thirty (30) consecutive day gap in coverage or status as an approved "trainer" by the Carrier at any time.

14.5    The Handling Company shall promptly and accurately record all training activities of each of its employees, as well as the results of such training.

14.6    No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Carrier's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  GROUND SERVICE EQUIPMENT

15.1    Should the Carrier transfer ownership of some or all of the GSE required for this Agreement to the Handling Company, the parties shall have the following rights

DEF-000177

with respect to the purchase and sale of Ground Support Equipment (GSE) under this Agreement:

(i)   In the event of the termination or expiration of this Annex B, the Carrier may elect to purchase from Handling Company some or all GSE used by Handling Company to provide service to the Carrier at DEN under the terms of this Annex B and meeting the criteria set out in sub-paragraph 15.3. Carrier's call option will apply to the specific inventory of GSE as listed on Attachment A. The purchase price for any GSE purchased by the Carrier will be as defined on Attachment A, but for avoidance of doubt, shall be the unamortized value (book value) of the GSE at the date of termination or expiration of this Annex B.

(ii)   In the event of the termination of this Annex B prior to the conclusion of its the Initial Term, the Handling Company may elect to sell to Carrier all GSE used by the Handling Company to provide service to the Carrier at DEN under the terms of this Annex B, and which meets the criteria set out in sub-paragraph 15.3. The Handling Company's put option will apply to the specific inventory of equipment as listed on Attachment A. The sale price for ground support equipment will be as defined on Attachment A but for avoidance of doubt shall be the unamortized value of the ground support equipment at the date of termination of this Annex B.

15.2   At the Carrier's request, the Handling Company must provide to the Carrier copies of all the necessary maintenance records and manuals for all equipment as listed on Attachment A. The Carrier's call option and Handling Company's put option will apply only to the specific inventory of equipment as listed on Attachment A (as might be revised from time to time via an amendment to this Annex B determined to the last Periodic Update of Attachment A preceding the exercise of the put or call option) and which is in a safe and in-service condition and meets the Carrier's maintenance standards and conditions (not to be unreasonably interpreted with the assumption being that all in-service equipment at the date on which the put or call option is exercised meets this standard). No further warranty as to the condition of the GSE will be provided by the Handling Company unless otherwise subsequently agreed to in writing.

## PARAGRAPH 16.  COMPLIANCE WITH LAWS

16.1   The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

16.2   The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations

DEF-000178

required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

16.3    Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B. In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

16.4    Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

### PARAGRAPH 17.  CONFIDENTIALITY AND DATA PROTECTION

17.1    The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

17.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

17.3    Prior written consent to any disclosure shall be obtained from the Carrier.

17.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning

DEF-000179

on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

17.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier. Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

17.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 18. ANTI BRIBERY AND CORRUPTION

18.1    The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

18.2    Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 19. MISCELLANEOUS .

19.1    Each provision of this Agreement is severable and distinct from the others. Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law. If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

19.2    In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

DEF-000180

19.3    The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

19.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

19.5    This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

*[The remainder of this page intentionally left blank.]*

DEF-000181

19.6   All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program. The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred. The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees. More information can be obtained at http://frontier.globalrms.com/.

Signed the _16th_ day of _September_, 2016

At Denver, Colorado, U.S.A.

for and on behalf of
**Frontier Airlines, Inc.**

By: _____
Name: Howard Diamond
Title: SVP & General Counsel

Signed the _6_ day of _September_, 2016

at _Denver, Colorado, USA_

for and on behalf of
**Simplicity Ground Services, LLC**

By: _____
Name: Terence P. Trainor
Title: President & COO

DEF-000182

ATTACHMENT A

## GROUND SUPPORT EQUIPMENT (GSE)
[To be completed via a written amendment to this Agreement should the Carrier transfer ownership of any GSE to the Handling Company.]

Should the Handling Company acquire the Carrier's GSE, the Handling Company shall then provide all GSE, maintenance, and fuel required to provide the Services listed in this Annex B. The Handling Company would then be required to maintain and make available upon request of the Carrier, the Handling Company's locally documented maintenance program for its GSE. The Handling Company would also maintain a sufficient level of safe and serviceable GSE and assumes responsibility to secure agreements to obtain alternative GSE if the Handling Company equipment cannot meet daily operational needs.

The Handling Company shall provide the Carrier upon request an inventory list of all GSE used to provide services under this Agreement in format set out below.

In the event that the Carrier shall exercise its Call option on the GSE, then the Handling Company shall provide to the Carrier all work records (Preventive Maintenance ("PM") as well as Repair Maintenance), for all ground equipment used to provide services under this Annex B in the following format: Work records shall include but are not limited to unit identification number, serial number, date(s) of work completion(s), hours on unit at listed work completion, parts installed during listed work, and labor hours spent on listed PM(s).

| Asset Type | Manufacturer | Model | Unit Number | Used/New | Net Book Value at commencement of ownership change | Monthly amortization rate | Amortization Period (mths) from commencement of ownership change |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

DEF-000183

## ATTACHMENT B

## STAFFING LEVELS

| Resource | | [illegible] | | | | |
|---|---|---|---|---|---|---|
| | | Heads | Hours | Avg Hrs | HPT | |
| Team Leaders | | | | | | |
| | FT | 28 | 980.0 | 35.0 | | Revised to eliminate SB and RON manpowe<br>Includes 1 Tow Team AM & PM |
| | PT | | | | | |
| | Sub Ttl Team Leaders | 28 | 980 | 35.0 | 2.27 | |
| Ramp Agents | | | | | | |
| | FT | 72 | 2,520.0 | 35.0 | | 319 @ 2.5 includes 1 Tow Team AM & PM<br>320 @ 3.5<br>321 @ 4 |
| | PT | | | | | |
| | Sub Ttl Ramp Agents | 72 | 2520 | 35.0 | 6.65 | |
| Bagroom | | | | | | |
| | FT | 18 | 570.0 | 31.7 | | |
| | PT | | | - | | |
| | Sub Ttl Bagroom | 18 | 570 | 31.7 | 1.32 | |
| Bag Runners | | | | | | |
| | FT | 12 | 480.0 | 40.0 | | 4 per shift |
| | PT | | | - | | |
| | Sub Ttl Bag Runners | 12 | 480 | 40.0 | 1.11 | |
| Ops | | | | | | |
| | FT | 10 | 400.0 | 40.0 | | 3 AM, 3 PM, 1 Overnight |
| | PT | | | - | | |
| | Sub Ttl Ops | 10 | 400 | 40.0 | 0.93 | |
| Lav Agent | | | | | | |
| | FT | 7 | 280.0 | 40.0 | | 2 per shift |
| | PT | | | - | | |
| | Sub Ttl Lav Agent | 7 | 280 | 40.0 | 0.65 | |
| Bag Lead | | | | | | |
| | FT | 2 | 80.0 | 40.0 | | |
| | PT | 2 | 70.0 | 35.0 | | |
| | Sub Ttl Bag Lead | 4 | 150 | 37.5 | 0.35 | |
| PSA | | | | | | |
| | FT | 20 | 800.0 | 40.0 | | Incl 2 sup per shift, SSO & special svc<br>1.3 @ Gate<br>1.5 @ Ticket |
| | PT | 55 | 1,925.0 | 35.0 | | |
| | Sub Ttl PSA | 75 | 2725 | 36.3 | 6.32 | |
| Supervisor | | | | | | |
| | FT | 16 | 640.0 | 40.0 | | 1 Ramp, 1 Bag, 1 Alloc per shift, 1 SST per shift |
| | PT | | | - | | |
| | Sub Ttl Supervisor | 16 | 640 | 40.0 | 1.48 | |
| Admin/Mgmt | | | | | | |
| | FT | 10 | 400.0 | 40.0 | | 1 Station Director, 4 DM, 1 SST, 1 Ramp & 1 Pax Mgr, 2 recruiting |
| | FT | | | - | | |
| | Sub Ttl Admin | 10 | 400 | 40.0 | 0.93 | |
| Total | | | | | | |
| | FT | 195 | 7,150.0 | | | |
| | PT | 57 | 2,395.0 | | | |
| | | 252 | 9,545.0 | | 31.22 | |