# EXHIBIT G

# *SMITHERS*

# *VS.*

# *FRONTIER AIRLINES INC*

### Deposition

### SHAWN P. CHRISTENSEN

*04/17/2019*

_____

## *AB Court Reporting & Video*

*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA

            Civ. Action No. 1:18cv676 (TSE/IDD)

            ------------------------------------------------------

            30(b)(6) DEPOSITION OF FRONTIER AIRLINES, INC., as
            given by SHAWN P. CHRISTENSEN
            April 17, 2019

            ------------------------------------------------------

            ANNE SMITHERS, et al.,

            Plaintiffs,

            vs.

            FRONTIER AIRLINES INC.,

            Defendant.

            ------------------------------------------------------
```

```
 1    APPEARANCES:

 2         STONE & WOODROW LLP
               By Thatcher Stone, Esq.
 3                William T. Woodrow, III, Esq. (via
                  videoconference)
 4                Suite 201, Louis & Clark Plaza
                  250 West Main Street
 5                Charlottesville, Virginia 22902
                    Appearing on behalf of Plaintiffs.
 6
           CHARLSON BREDEHOFT COHEN & BROWN, P.C.
 7             By Elaine Charlson Bredehoft, Esq.
                  11260 Roger Bacon Drive, Suite 201
 8                Reston, Virginia 20190
                    Appearing telephonically on behalf of
 9                Defendant.

10         CONDON & FORSYTH LLP
               By Bartholomew J. Banino, Esq.
11                7 Times Square
                  New York, New York 10036
12                  Appearing on behalf of Defendant.

13         Also present:  Anne Smithers, via
                          videoconference
14

15

16

17

18

19

20

21

22

23

24

25
```

1  A    If -- this is all situation dependent.
2  The allegation that she had the nebulizer was in the
3  documentation.  What -- how it occurred, when it
4  occurred, if -- if gate agents found out after the
5  fact, after the aircraft pushed back, again, point
6  in time.  I can't answer that question with any sort
7  of certainty.
8      Q    (By Mr. Stone)  Okay.  Is there any
9  training offered by Frontier for the removal of
10 passengers from an aircraft?
11     A    Yes.
12     Q    Could you explain that to me, please?
13     A    That -- I'm going to be very generic, and
14 I apologize.
15     Q    Sure.
16     A    The training would be done through the
17 station's representatives in a different department,
18 so I'm not familiar with all the level of detail
19 of -- of how they train and when they train, what
20 they train, all -- all those.  That's not my
21 specific area of expertise, but there is training
22 associated with that, yes.
23     Q    Okay.
24          MR. BANINO:  And, Thatcher, I just want to
25 point out that our objection to this is exactly what

1  the witness is saying, which is the -- the topic
2  itself is -- is so vague, it's not really something
3  that can --
4          MR. STONE:  Okay.  I look forward to
5  reading your objections in your motion.  I look
6  forward to it.
7      Q    (By Mr. Stone)  Do you know what specific
8  training was given here at DIA?
9          MR. BANINO:  Same objection.
10     A    The training that would be received would
11 be the same received by any --
12     Q    (By Mr. Stone)  Okay.
13     A    -- agent -- ramp agent, correct.
14     Q    Is that training compliant with Frontier
15 policies and procedures?
16         MR. BANINO:  Same objection.
17     A    The training would be either the Frontier
18 policies and procedures, or if more restrictive, by
19 the business partner.
20     Q    (By Mr. Stone)  Okay.  Are you aware of
21 what training the business partner gives its people
22 to remove passengers?
23         MR. BANINO:  Same objection.  I can't
24 imagine that they would know this information.
25 And it's outside --

1        MR. STONE:  I can't imagine that they
2   wouldn't, so we'll let the judge decide.
3        MR. BANINO:  It's -- it's --
4        MR. STONE:  Your opinion is interesting,
5   but not evidence.
6   A    The training that the business partner
7   would have -- excuse me -- would have given would
8   have been, again, in compliance with Frontier
9   policies and procedures.
10  Q    (By Mr. Stone)  So if there's a Frontier
11  policy and procedure about what to do with a
12  passenger who complains that a member of the flight
13  crew is inebriated, you would expect in removing or
14  doing whatever they do, the business partners'
15  agents and people to follow the Frontier policy and
16  guidelines, correct?
17       MR. BANINO:  Same objection.
18       Are you asking about Menzies' policies or
19  the gate agent's policies?
20       MR. STONE:  I'm asking him the question I
21  asked.
22       Would you mind, Vanessa, reading it back,
23  please.
24       (Last question read.)
25       MR. BANINO:  Yeah, I renew my objection.

1    I'm not sure how Frontier would know what --
2             MR. STONE:  Your objection is noted.
3             MR. BANINO:  How Frontier would know --
4             MR. STONE:  You objection is noted.
5             MR. BANINO:  -- what Menzies' policy are.
6             MR. STONE:  Maybe they told them.
7             MR. BANINO:  What the business partners --
8             MR. STONE:  Maybe they instructed them,
9    so --
10            MR. BANINO:  Okay.  But that's not --
11   that's not a 30(b)(6) question.
12            MR. STONE:  It is.  It's part of Item 3.
13            MR. BANINO:  Right.  But that's still
14   outside the scope.
15            MR. STONE:  Your objection is noted, Bart.
16   Let's keep going or we're going to be here all day.
17            MR. BANINO:  Okay.  Well, do you know
18   the -- do you know the gate --
19            MR. STONE:  He answered.
20            MR. BANINO:  -- the service agent's
21   policies?
22            MR. STONE:  He answered.
23            THE DEPONENT:  I don't.
24            MR. BANINO:  Okay.
25            MR. STONE:  He answered.

*** CONFIDENTIAL ***

1    Q    All right.  Well, we'll show them to you
2  after lunch.
3         MR. STONE:  I'd like to take a break now
4  for 20 minutes for lunch.
5         (Discussion off the record.)
6         (A lunch recess was taken from 12:39 p.m.
7         to 1:19 p.m.)
8    Q    (By Mr. Stone)  Can we look at No. 8,
9  please, Mr. Christensen?
10        Are you aware of the training given by
11 Frontier to its ground handling agents at Denver?
12        MR. BANINO:  Thatcher, just for the
13 record, we objected to this because they were not
14 Frontier ground handling agents.
15        MR. STONE:  Sure, they are.  They have a
16 contract with Frontier.  They're Frontier's agents.
17        MR. BANINO:  Right, but they're not
18 Frontier employees.
19        MR. STONE:  Okay.  Make your objection.
20 Objection's noted.
21   Q    (By Mr. Stone)  Please answer the
22 question.
23        MR. BANINO:  Well, he -- you haven't asked
24 him a question.  I'm just making clear that the
25 agents were not -- the ground handling agents are

*** CONFIDENTIAL ***

1   not Frontier employees.

2       MR. STONE:  I understand that.

3       MR. BANINO:  So he wouldn't -- he wouldn't

4   know what their training is.

5       MR. STONE:  Well, let him tell me he

6   doesn't know.  You're not testifying.

7       MR. BANINO:  No, no.  That's fine.  I just

8   wanted to be clear about the objection.

9     Q  (By Mr. Stone)  So Mr. Christensen, on the

10  6th of September 2016, Frontier signed a ground

11  handling agreement with Simplicity Ground Services,

12  LLC.  Have you heard that name before?

13    A  I have.

14    Q  And who are they?

15    A  They are one of the business partners that

16  Frontier utilized.

17    Q  Are they related to Menzies or not?

18    A  As far as I know, they are not.  I believe

19  they're two separate entities.

20    Q  So they're a different company --

21    A  Correct.

22    Q  -- than Menzies.

23    A  Correct.

24    Q  Okay.  And do you know what training those

25  people received with respect to No. 8?

*** CONFIDENTIAL ***

1  A   I don't.  It's got to be approved by the
2  air carrier, so an approved air carrier --
3  Q   Right.
4  A   -- training program.  I don't know what
5  that training program looks like.
6  Q   So you don't know anything that they may
7  have been trained about.
8  A   I don't.
9  Q   Would it be possible --
10       MS. BREDEHOFT:  Excuse me.  Can I
11  please --
12       MR. STONE:  Please don't interrupt me.
13       MR. BANINO:  Thatcher, she started her
14  objection.
15       MR. STONE:  She didn't.  I was talking.
16       MS. BREDEHOFT:  Excuse me.
17       MR. BANINO:  Go ahead, Elaine.
18       MS. BREDEHOFT:  So -- okay.  So we
19  objected -- I'm sorry, I was cut off for a little
20  while.  I just got in here so I don't know what else
21  I might have missed, but we did object to the Topic
22  8 as being vague, ambiguous, overly broad, unduly
23  burdensome, not relevant, not likely to lead to
24  discovery of admissible evidence, and that it also
25  was unspecified in terms of training, ground

*** CONFIDENTIAL ***

1   handling agents, passengers in similar
2   circumstances, and was a hypothetical.
3           So we indicated that we could not provide
4   a witness to testify on nonspecific, ambiguous and
5   hypothetical areas of inquiry, and it's not a proper
6   request for a corporate designee deposition.
7           MR. STONE:  Okay.  Your objection is
8   noted.
9      Q    (By Mr. Stone)  Mr. Christensen, answer
10  the question, please.
11          MR. BANINO:  Can you repeat the question?
12  I'm not sure there was a question.  Can you repeat
13  if there was?
14          (Page 184, Lines 6 through 9 read.)
15     Q    (By Mr. Stone)  Mr. Christensen, would it
16  be possible for you, if you went back and talked to
17  other people at Frontier, to determine what
18  training, if any, the ground handling agents that
19  have a contract with Frontier at DIA received in
20  order to make sure they were doing things the way
21  Frontier wanted?
22          MR. BANINO:  I'm going to object both to
23  the form of the question --
24          MR. STONE:  Yeah, I understand you're
25  objecting.

*** CONFIDENTIAL ***

1   MR. BANINO:  But I'm objecting to the form
2 of the question as well, and so you may want to
3 rephrase it, but --
4   Q   (By Mr. Stone)  Can you go back to
5 Frontier and talk with your colleagues and determine
6 what training requirements are given to ground
7 handling agents to comport with Frontier policy?
8   A   I could.  That would be a different
9 department, yes.
10   Q   Okay.  Thank you.
11       Going back to our discussion about what to
12 do with a passenger who alleges that a member of the
13 cockpit crew is inebriated, is there any record in
14 any of the Frontier materials you have reviewed for
15 this deposition that show what safety concern was in
16 place that legitimized Mrs. Smithers being removed?
17   A   I don't recall outside of the context of
18 the social media postings that --
19   Q   The Tweet.
20   A   Tweets, yes.
21   Q   One Tweet, correct?
22       MR. BANINO:  No, Thatcher, please don't
23 argue -- we're too early in the afternoon for you to
24 be arguing with the witness.
25       MR. STONE:  I'm not arguing with the